IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Sherry Johnson, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-269 |
| Kenosha Unified School District, | ) | |
| Sue Savaglio-Jarvis, and | ) | |
| Shana Lewis, | ) | |
| Defendants. | ) | |

## DEFENDANT SHANA LEWIS'S
## MEMORANDUM IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

Defendant Shana Lewis ("Lewis"), by her attorneys, Halling & Cayo S.C., moves the Court for summary judgment pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56, and seeks an Order dismissing the Complaint (ECF No. 1) against her.

Previously, Lewis moved the Court to dismiss the Complaint for failure to state a claim (ECF No. 11). On October 25, 2022, this Court denied the motion (ECF No. 17), stating that while "Lewis's defenses seem strong" (*id.* p. 1), the allegations in the Complaint were sufficient to proceed to discovery.

Lewis's defenses remain strong and the case against her has not gotten better with age. As will be set forth below, the undisputed facts show that Plaintiff Sherry Johnson ("Johnson") cannot recover against Lewis. The extraordinary circumstances under which a private bar attorney can be held liable under 42 U.S.C. § 1983 (a civil action for deprivation of rights under color of law) do not exist here, but even if they did, Johnson's claims fail due to additional factual and legal

deficiencies. In the alternative, Lewis is entitled to qualified immunity. Accordingly, the Complaint against Lewis must be dismissed.

## FACTS

Defendant Shana Lewis is a Wisconsin attorney concentrating on school law. She is employed by Renning, Lewis & Lacy (formerly Strang, Patterson, Renning, Lewis & Lacy), and has been in practice since 1999. (SLSOF 1[1].) Lewis currently represents approximately 50 school districts, and her firm represents more than 150 in Wisconsin. (SLSOF 2.)

In the course of her work with school districts, she has "often assisted school districts in evaluating their obligations to refer staff members" for "educator misconduct claims." (SLSOF 3.) Lewis also works with school district administrators to investigate personnel and participate in hearings related to termination. (SLSOF 4.)

Lewis's firm was approved by the defendant Kenosha Unified School District (KUSD) and it superintendent Sue Savaglio-Jarvis[2] to perform legal services for KUSD for several years, and at all times relevant to the complaint against her. She worked on multiple matters for KUSD during that time. (SLSOF 5.)

Plaintiff Sherry Johnson had been a special education teacher within KUSD; from September of 2017 through December 2019, she worked at Prairie Lane Elementary School. (SLSOF 6.) Each year, Johnson had "case loads" consisting of several special education students in a specific grade band. (SLSOF 7.)

---

[1] "SLSOF" refers to Defendants Shana Lewis' Statement of Facts, filed herewith.
[2] Sue Savaglio-Jarvis is sometimes referred to as "Dr. Sue" in testimony.

During the 2018-19 school year, Johnson had been assigned an in-building mentor, fellow special education teacher Randall Wehr. (SLSOF 8) The mentoring relationship between Johnson and Wehr succeeded during the first year, but fell apart the second year. (SLSOF 9.)

During the Fall 2019, Johnson continued to work without a district mentor. (SLSOF 10.) Prior to the incident complained of here, Johnson had a relatively clean disciplinary record but had one "write up" for a dress code violation. (SLSOF 11.)

Sherry Johnson's Alleged Misconduct

On October 23, 2019, Wehr witnessed Johnson appearing to lead a student in her charge through the hallway by the collar of his shirt. This student had special needs including Down syndrome and difficulty with ambulation. (SLSOF 12.) Wehr believed he had witnessed Johnson using inappropriate force, and informed Prairie Lane principal Camille Schroeder ("Schroeder") she should review the video of Johnson and the pupil. (SLSOF 13.)

Schroeder viewed video of the incident and escalated the matter to the district human resources department. (SLSOF 14.) District human resources coordinator Maxceen Augustus ("Augustus") investigated the matter under the supervision of Chief Human Resources Officer Lindsey O'Connor. (SLSOF 15.)

The investigation included interviews and/or statements from Wehr, Schroeder, and Johnson, among others. (SLSOF 16.) Initially, on October 29, 2019, Johnson confirmed in writing that she knew the video looked unprofessional, that the incident should not have happened, and that she took full responsibility for her actions. (SLSOF 17.)

Johnson wrote additional clarifying statements. Later on October 29, 2019, she sent an email to Augustus stating that she should have slowed down but that she did not hurt the child, nor

was she angry or stressed. (SLSOF 18.) The next day, in another email to Augustus, Johnson defended her conduct as using a "choo-choo" motion and sound effect to direct the student. (SLSOF 19.)

On the other hand, in his initial statement, Wehr described this conduct as: "As they passed me, Mrs. Johnson holding the scruff of the student's t-shirt balled up in her right hand. Mrs. Johnson looked to me to be discontented by the look on her face." (SLSOF 20.) Later, Wehr, in his investigative interview, stated that the student's "feet seemed to be barely touching the ground." (SLSOF 21.)[3]

Johnson was placed on paid administrative leave on October 29, 2019. (SLSOF 23.)

Following further investigation, KUSD human resources personnel, in conjunction with the superintendent, recommended that Johnson's employment with the district be terminated. (SLSOF 24.) On November 26, 2019, Johnson was presented with a Statement of Charges (the "Statement") notifying her as to the recommendation she be terminated and her hearing rights, and was placed on unpaid disciplinary suspension. (SLSOF 25.)

The Statement alleged that "while working with Student D, Ms. Johnson grabbed him by the arm and led him out of the cafeteria; then she grabbed Student D by the scruff of his neck with a portion of his t-shirt in her hand and dragged him down the hallway." (SLSOF 26.)

The Statement recited that Johnson's conduct constituted "unreasonable and excessive force with a student in violation of Section 7 of the KUSD Employee Handbook" and "unreasonable and excessive force with a student in violation of Board Policy" as well as a failure "to perform many of the essential responsibilities and interpersonal skills of her position as a

---

[3]Lewis did not participate in the investigative interviews or in drafting any witness statements. (SLSOF 22.)

Prairie Lane Teacher, including but not limited to: Customize and personalize learning activities to address students' diverse learning styles, working strategies, and abilities[.]" (SLSOF 27.) The Statement concluded that there was just cause to terminate Johnson's employment from KUSD. (SLSOF 28.)

Johnson denied all wrongdoing and requested a public hearing. (SLSOF 29.) The public hearing was originally scheduled for December 17, 2019, but was rescheduled to March 3, 2020, at Johnson's attorney's request. (SLSOF 30.) Johnson was represented by counsel, Taviss Smith, for the termination proceedings. (SLSOF 31.) Lewis represented the KUSD administration at the hearing and another outside attorney from a different firm, Chrissy Hamiel, represented the school board. (SLSOF 32.)

At the time of the hearing, Thomas Duncan was a member of the school board. (SLSOF 33.) Duncan spent the final year of his three-year term on the school board as its president, but was not president at this point. (SLSOF 34.)

Lewis presented the termination case on behalf of KUSD administration. She called witnesses who testified in favor of Johnson's termination (including Wehr, Schroeder, and Augustus, as well as O'Connor on rebuttal) and presented documentary evidence. (SLSOF 35.) Johnson, by her attorney Smith, also called witnesses, including Johnson as well as Bonnie Connelly, Mary Roach, and Jill Jackson. (SLSOF 36.) The video of the incident was played at the hearing. (SLSOF 37.)

Relevant here is an allegation that Augustus had been "forced" and/or "coached" to testify against her will. (See ECF No. 1 ¶ 66.) Human Resources coordinator Augustus did testify, in response to an open-ended question by Lewis, as to her experience with her own child who had special needs. (SLSOF 38.) Augustus also testified in response to cross-examination by Johnson's

5

counsel, who asked specifically as to Augustus's child who had special needs. (SLSOF 39.) Johnson acknowledged that Lewis did not ask Augustus any question that required Augustus to disclose she had a special needs child. (SLSOF 40.)

Duncan, at his deposition, testified that he was "informed that Dr. Sue and Ms. Lewis coached the interviewees on what they were to say during the investigation," but he did not say who "informed" him of this, only referring to them as "contacts." (SLSOF 41.) Duncan further testified that it was his "understanding," from Augustus, that Augustus was "coached." (SLSOF 42.) However, Duncan was not present for any of Augustus's preparation for her testimony. (SLSOF 43.) Duncan did not have an understanding of what "coached" meant, only that "[Augustus] was informed as to what she should be saying during the hearing." (SLSOF 44.) Duncan acknowledged that he is not a lawyer. (SLSOF 45.)

Following testimony, the Board proceeded into closed session with its counsel, Hamiel, and an administrative assistant, Stacy Busby.[4] (SLSOF 46.) Busby made contemporaneous notes of the closed session, and typed them after the hearing. (SLSOF 47.) Duncan conceded that Busby's notes must be accurate. (SLSOF 48.) Neither Johnson nor Lewis were present in the closed session. (SLSOF 49.)

During the closed session, the Board reviewed the evidence and testimony, and watched the video of the incident. Per Busby's notes, the Board members were divided—at least one thought Johnson should not be employed as a teacher at all, and another thought she should at least acknowledge her wrongdoing. Several members of the Board did not believe Johnson's conduct warranted termination, and some expressed a belief that she had done nothing wrong. (SLSOF 50.) There was no vote of any kind recorded in closed session. (SLSOF 51.)

---

[4] Stacy Busby is now known as Stacy Schroeder, but will be referred to as "Busby" through this brief to reflect her name in the contemporaneous records.

The Board reconvened in open session and voted unanimously to allow Johnson to resign, with a neutral reference. (SLSOF 52.)

Other than the vote to reconvene in open session and the vote to allow Johnson to resign with a neutral reference, there were no other votes taken, and there was no discussion or finding by the Board as to whether or not Johnson had committed misconduct. (SLSOF 53.) There was no public statement that Johnson had been "exonerated" or that there were no grounds for termination. (SLSOF 54.)

As of the March 3, 2020 hearing, however, Johnson had already begun working for a new employer, Racine Unified School District. (SLSOF 55.) In May 2021, Johnson relocated to Texas, she was originally from and where her husband had pursued an unexpected job opportunity, and would become employed as a teacher there herself. (SLSOF 56.) O'Connor and Augustus later left the district. (SLSOF 57), and superintendent Savaglio-Jarvis elected to retire June 30, 2021. (SLSOF 58.)

In one of Duncan's final acts on the school board, he made the motion to remove Lewis' law firm from the list of approved providers. (SLSOF 59.). At his deposition, Duncan explained he moved to remove Lewis's law firm was because Lewis was aggressive at the hearing: she was "interrogating . . . the witness"; "she unmercifully tore Sherry apart" during the open session. (SLSOF 60.) Duncan testified later that the characterization of "unmerciful" was his personal opinion. (SLSOF 61.)

The License Referral and Investigation

On March 6, 2020, KUSD Chief Human Resources Officer Lindsey O'Connor filed a License Review Referral ("Referral") (form PI-1620) with the Wisconsin Department of Public

Instruction (DPI). (SLSOF 62.) Per Wis. Stat. § 115.31, school district administrators are required to report to the DPI for potential investigation any employee licensed by DPI who "resigns and the administrator has a reasonable suspicion that the resignation relates to the person having engaged in immoral conduct." Wis. Stat. § 115.31(3)(a)4. "Immoral conduct" includes conduct "contrary to commonly accepted moral or ethical standards and that endangers the health, safety, welfare, or education of any pupil." Wis. Stat. § 115.31(1)(c)1. This is a responsibility of the school administrator (in this case, Savaglio-Jarvis) or her designee (in this case, O'Connor) and is separate from any responsibilities the Board may have. Criminal penalties, including imprisonment for up to six months, can follow for a willful failure to report. Wis. Stat. § 115.31(7).

Once the DPI receives a Referral, DPI staff may investigate and then the DPI determines whether there is probable cause that misconduct occurred. (SLSOF 63.) If there is no probable cause, the matter is dismissed. If there is probable cause, the DPI may proceed to an administrative hearing to determine by preponderance of the evidence whether immoral conduct has occurred (SLSOF 64.)

As stated, the Board did not make any findings as to whether Johnson had actually engaged in immoral conduct. (SLSOF 54, 65.) As the charge was not resolved, statute directed that the referral be filed. O'Connor, as chief human resources officer, did so. (SLSOF 62.)

O'Connor was new to school district human resources and did not know the Referral process, so she relied on Savaglio-Jarvis for language, and looked up the controlling statute. (SLSOF 66.) Ultimately, O'Connor entered "The employee used excessive force to move a child" in the "Alleged Misconduct" filed, and "Resigned in the face of immoral conduct charge" in the "Employment Status with School District" field. (SLSOF 67.)

8

Once the Referral was filed, Lewis responded to an inquiry from DPI in which the investigator sought the transcript of the disciplinary hearing, as well as an inquiry from Johnson's counsel. A transcript had not been prepared initially, but Lewis, on behalf of KUSD, agreed to have one prepared and filed. She had no further involvement with the investigation. (SLSOF 68.)

The investigation did take a number of months; however, it began in March 2020, right as the Covid-19 pandemic was beginning in earnest and as the DPI became understaffed and overtaxed. (SLSOF 69.) DPI counsel Ben Jones cited the pandemic disruption as a contributing factor in the Johnson investigation taking as long as it did. (SLSOF 70.)

In the interim, Johnson applied for licensure in Texas, and the Texas Education Agency (TEA), the DPI equivalent there, investigated the Wisconsin allegations as well. (SLSOF 71.)

The TEA investigation persisted into Summer 2021. By this time, Duncan had left the school board and had no authority to act on its behalf. (SLSOF 77.) However, he learned from the pastor at his church that Johnson was experiencing difficulty getting licensed in Texas, and he took it upon himself to contact the TEA. (SLSOF 72.) sending litany of grievances he had with KUSD. Relevant to Lewis, these grievances included:

> The Board came to the unanimous conclusion that Sherry Johnson had been wrongly accused and determined there were no grounds for termination and would accept her letter of resignation while expressing that we were embarrassed by the hearing and felt a great loss of an excellent special education teacher to the district.
> …
>
> The Human Resources coordinator with a special needs child was forced to provide testimony against her will and was coached by the districts prosecuting attorney on exactly what to provide as far as testimony;
> The Chief Human Resources Officer resigned her position following this incident and sent a letter to the Board initiating a formal complaint that led to an investigation and discipline with respect to the Superintendent and concluding all legal services with the attorney and her law firm who was prosecuting the case;
> …

9

During the investigatory process we learned that the Superintendent and the prosecuting attorney forced the Chief Human Resources Officer to file the completely inaccurate and untrue License Review Referral the day following the hearing. This letter and all related documentation was subsequently removed from Ms. Johnson's DPI file[.]

(SLSOF 73"[5]). However, deposition testimony from district personnel, and from Duncan himself, contradicts the representations Duncan made in the letter:

- Augustus, the Human Resources coordinator, was not "forced" to testify, as to her child with special needs or otherwise. She did so in response to open-ended questions; Lewis did not ask her about her child. Johnson's attorney Smith did ask her a specific question, however, on cross-examination. (SLSOF 38-39.)

- The sentiments by the Board were not unanimous (SLSOF 50), and were never expressed in open session. As Lewis and Savaglio-Jarvis were not present in the closed session (SLSOF 49), they had no way of knowing whether anyone was embarrassed or believed KUSD would be losing an "excellent special education teacher." There was never a public expression that Johnson had been exonerated or even that there were "no grounds for termination." (SLSOF 53-54.)

- Duncan himself decided to conclude services with Lewis' firm, and he testified it was because Lewis was "unmerciful" in her cross-examination. There was no investigation or discipline regarding her firm. (SLSOF 59-61.)

- The Referral was not "completely inaccurate and untrue"; in fact, it was true. Although the Board had ultimately allowed Johnson to resign and did not fire her, she was accused of using excessive force (see Statement of Charges, Ex. I to Rosenzweig Decl.), which

---

[5] Johnson, in her deposition, admitted she sued Lewis solely because of the information in the Duncan. She did not do anything to corroborate the information in the letter. (SLSOF 74.)

administration reasonably believed to be immoral conduct, and resigned without the Board having dismissed or otherwise publicly weighed in on those charges. [6]

- The DPI did not remove the Referral from its file; DPI counsel Ben Jones produced it in August 2023 for his deposition. (SLSOF 75.)

- The DPI did not remove "all related documentation" from its file; Jones testified that he reviewed emails (SLSOF 76) and the transcript of the Johnson disciplinary hearing (SLSOF 77) prior to his deposition on August 7, 2023.

In addition, Duncan admitted in his deposition that he did not explain to the TEA that he was no longer on the school board and had no authority to act as he did. Nonetheless, his letter made numerous references to "we"—not to him individually—which, grammatically, suggests he was speaking on behalf of more than one person, perhaps even the entire Board. (SLSOF 77.) Duncan brushed his failure off as a "mistake on my behalf." (SLSOF 78.)

Eventually, KUSD's new human resources leader did contact DPI. (SLSOF 34.) DPI legal counsel Ben Jones watched the video of the incident and a decision was made to close the investigation two days later (SLSOF 80.)

Of note, Jones testified at his deposition that he provided training to school attorneys, including Lewis, specifically regarding district requirements to fill out referral forms "when there's reasonable suspicion to believe that somebody has resigned or been terminated due to immoral conduct." (SLSOF 81.) He further testified that nobody at DPI had any problems with the contents of the Referral or that it failed to articulate a "reasonable suspicion" as the law requires. (SLSOF 82.)

---

[6] The truthfulness of the Referral will be discussed in a later section.

Johnson became licensed in Texas thereafter and has been employed as a teacher there. (Ex. 83.)

ARGUMENT

## I.   LEGAL STANDARDS

"Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court will review evidence in the light most favorable to Johnson, the non-moving party. *Brunson v. Murray*, 843 F.3d 698, 704 (7th Cir. 2016). Lewis is entitled to summary judgment absent sufficient evidence from Johnson to create a dispute of any material fact of any essential element of her legal claims on which she bears the burden of proof. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323.

Lewis is entitled to summary judgment on both counts alleged against her, and dismissal of the Complaint, with prejudice.

## II.   JOHNSON HAS FAILED TO SHOW LEWIS WAS ACTING IN CONSPIRACY WITH ANY DEFENDANT TO DEPRIVE JOHNSON OF HER CIVIL RIGHTS, DOOMING HER CLAIMS

Johnson's claims against Lewis arise under 42 USC § 1983. A threshold requirement of any Sec. 1983 claim requires a showing that a plaintiff was deprived of a constitutional or federal right, by a defendant be acting under color of law. See, e.g., *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). However, a private attorney does not automatically act "under color of law" simply from being retained by a government client:

> [A]ttorneys are private actors who do not function under color of law unless they work in concert with government officials to deprive persons of their constitutional rights. *See Tower v. Glover*, 467 U.S. 914, 920, 104 S. Ct. 2820, 81 L. Ed. 2d 758 (1984); *Thurman*, 446 F.3d at 687. Whether privately retained or appointed by a court, lawyers do not act under color of law merely by representing their clients. See *Polk County v. Dodson*, 454

12

U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); *Myers v. Vogal*, 960 F.2d 750, 750 (8th Cir. 1992); *Hutcherson v. Smith*, 908 F.2d 243, 245 n.2 (7th Cir. 1990) (declining to hold that any attorney retained by a municipality automatically satisfied the "under color of law" requirement).

*Hefley v. Bruch*, 276 F. App'x 506, 507 (7th Cir. 2008). See also *Wilson v. Warren Cty.*, 830 F.3d 464, 468-69 (7th Cir. 2016); *Polk Cty. v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445, 453, 70 L.Ed.2d 509, 521 (1981). Further:

> For a private actor to act under color of state law he must have "had a 'meeting of the minds' and thus reached an understanding" with a state actor to deny plaintiffs a constitutional right. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); see also *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000) (requiring a showing of "a concerted effort between" a private actor and state actor and that a state actor and private actor "reached an understanding to deprive the plaintiff of her constitutional rights"); *Cunningham v. Southlake Ctr. for Mental Health, Inc.,* 924 F.2d 106, 107 (7th Cir. 1991)[.]

*Wilson* at 468 (additional sources omitted). Here, Lewis is a private attorney (SLSOF 1), and only when attorney and client have acted volitionally, in concert, in order to deprive a plaintiff of constitutional rights, can liability under Sec. 1983 attach to the attorney. See *Wilson* and cases cited therein, *supra.*

We note that because of the "meeting of the minds" requirement (*Wilson* at 468, citations omitted), should this matter be dismissed as to KUSD and Savaglio-Jarvis on any grounds, the Complaint against Lewis must be dismissed as well. If there are no constitutional violations made by the other Defendants, Lewis could not have acted in concert with them to engage in said constitutional violations. When there is no "evidence of some concerted effort or plan between the private party and the state officials," a Sec. § 1983 claim must be dismissed. *Moore v. Marketplace Restaurant, Inc*., 754 F.2d 1336, 1352-1353 (7th Cir. 1985).

13

The undisputed evidence shows that Lewis came into the Johnson matter after the investigatory interviews (SLSOF 22), but ahead of the disciplinary hearing, and represented the District's administration at the hearing (SLSOF 32). As the administration's lawyer, she put on the case against Johnson and called witnesses. (SLSOF 35.) Lewis also acted on behalf of KUSD in discussions with Johnson's attorney concerning the Referral and proposed neutral letter of reference, and again in discussion with DPI regarding production of a hearing transcript. (SLSOF 68.)

Well after the fact, Tom Duncan testified he was not happy with Lewis's performance at the hearing, and believed that she "tore" Johnson apart (SLSOF 60). But, that is what cross-examination involves. It is not a conspiracy for a lawyer to assertively question a witness. This seems to illustrate a stylistic disagreement with Lewis's lawyering—perhaps a profound one—but it is not the basis for liability to Johnson.

These are all indicia of a routine attorney-client relationship, and services rendered to ensure KUSD complied with its rules and state statutes. Johnson, at her deposition, was unable to point to any evidence of any conspiracy—by anyone—to deprive Johnson of any rights. (SLFOF 88.) That is because there is no evidence. There was no conspiracy. Johnson's claims against Lewis must be dismissed.

III.     JOHNSON'S CLAIMS AGAINST LEWIS FAIL INDEPENDENT OF ANY ALLEGED CONSPIRACY

As can be seen in the deposition transcripts[7], the attorney for KUSD (and the attorney for Lewis, on KUSD's behalf) repeatedly asserted attorney-client privilege regarding conversations KUSD employees had with their counsel in the course of employment. Johnson may attempt to

---

[7] The transcript of Shana Lewis's deposition was filed in its entirety. ECF No. 31-4.

exploit that fact and claim that testimony into privileged communications would reveal actionable misconduct, or at the very least would create a dispute of fact to defeat summary judgment. However, as will be set forth below, there is nothing that Lewis did or did not do—or could have done or not done—that would allow Johnson to prevail in the claims against her. Independent grounds exist for dismissal of the claims against Lewis.

A. JOHNSON'S FIRST AMENDMENT CLAIM FAILS ON THE FACTS AND ON THE LAW

In her Complaint, Johnson alleged that Lewis and Savaglio-Jarvis retaliated against Johnson for engaging in "constitutionally protected speech or conduct to protect a special education student." (ECF. No. 1 ¶ 102). The Complaint also alleges that "Johnson spoke out as an advocate to protect the rights of a special education student." (*Id.* ¶ 105)

Again, Johnson was not able to identify any evidence that Lewis retaliated against her, or constructively discharged her, for any reason. (SLSOF 86-87.) But beyond that, clarification as to the "constitutionally protected speech or conduct" was elicited at her deposition. Johnson testified that *all* of her speech and advocacy were performed in the course of her public school job. (SLSOF 85.)[8] She was not acting as a citizen, but as a teacher and employee of KUSD. Putting aside the complete lack of evidence that Johnson was engaging in any advocacy to "protect the rights of a special education student"—presumably the student involved in the incident leading to her termination—any alleged advocacy was done in her employment role.

---

[8] Moreover, despite alleging that Lewis was involved in the referral in retaliation for Johnson's "advocacy," Johnson testified she was unaware of any such knowledge Lewis may have possessed prior to the Referral. (SLSOF 89.)

It is well settled that public employees do not have First Amendment protection for speech in the course of their public duties, and accordingly, Johnson cannot make a First Amendment claim for this speech.

> In order for a public employee to make out a claim of First Amendment retaliation against a government employer, the employee must first establish that he or she was engaging in protected speech. "The threshold inquiry is whether the employee was speaking as a citizen; only then do we inquire into the content of the speech." *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). When a public employee speaks on matters pursuant to employment duties, that speech is not protected under the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 422, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). This is because "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe on any liberties the employee might have enjoyed as a private citizen." *Id.*

*Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 538. *See also Mayer v. Monroe County Cmty. Sch. Corp.,* 474 F.3d 477 (7th Cir. 2007) (analyzing *Garcetti*, the seminal Supreme Court case denying First Amendment protections to government employees' speech in the course of their duties, and applying it to public school teachers).

*Hatcher* involves a political science professor at Southern Illinois University (SIU) who was denied tenure. The proffered reasons for denial were lack of excellence in research and lack of peer reviewed publications. A year before her tenure review, she "assisted a graduate student in the political science department in making a complaint to SIU about a faculty member who the student claimed was sexually harassing her." (*Id*. p. 536.) Hatcher filed a charge of discrimination and then a lawsuit alleging gender discrimination, Title VII retaliation, and First Amendment claims. (*Id*.) Her case was dismissed and she appealed.

Relevant here, Hatcher argued that "SIU retaliated against her for engaging in protected speech under the First Amendment by speaking on behalf of a student about sexual harassment." (*Id*. p. 538.) The district court and the 7th Circuit rejected that argument, on a motion to dismiss,

finding that she did not allege sufficient facts to state a claim that she was acting outside of the scope of her employment.

In the instant matter, we are at summary judgment rather than a motion to dismiss, but the rationale expressed in *Hatcher*, citing *Garcetti*, still applies— Johnson has not provided any evidence she was speaking as a citizen (*Hatcher* at 539) and not as an employee of KUSD. Here, Johnson testified repeatedly that she was engaging in "advocacy" entirely within the course of her job—she was not speaking at a public meeting regarding special education funding, or writing a letter to the editor of a newspaper about treatment of special education students. She has no First Amendment rights regarding speech in the course of her employment.

If Johnson is not entitled to First Amendment protections for her actions here, then Lewis cannot be liable for violating any First Amendment rights, conspiracy or no conspiracy.

Even beyond that, however, Johnson's claim fails as to Lewis as there is no indication in the record that Lewis knew of any "advocacy" in the first place. (SLSOF 89.) The evidence indicates Lewis was aware of the incident with the student that gave to Johnson's disciplinary hearing and ultimate resignation, and that Lewis became involved only after the administration determined termination was appropriate. (See SLSOF 22, 32.) Lewis could not have retaliated against Johnson for speech or advocacy if she did not know of the speech or advocacy. "In order to establish that a defendant retaliated against a plaintiff because of a protected constitutional right, a plaintiff must demonstrate that the defendant knew of the retaliation and knew of the plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999).

In representing the administration, she was simply doing her job.

B. JOHNSON RECEIVED ALL DUE PROCESS TO WHICH SHE WAS ENTITLED

Johnson's second count against Lewis alleges that she, along with Savaglio-Jarvis, conspired to deprive Johnson of her due process rights by "filing a malicious and false license referral to the Wisconsin Department of Public [I]nstruction after the Plaintiff separated from the KUSD." (ECF No. 1¶ 109.) The Complaint further alleged a conspiracy to deny Johnson equal protection, to retaliate against her for electing a public due process hearing, and again to retaliate against her for advocating for special education students both at the hearing and generally.

There is no evidence whatsoever that any of this occurred. Finger-pointing is not evidence. In fact, there is no evidence that Lewis was involved in the decision to make the license referral at all. She did not sign it; Lindsey O'Connor filled it out and testified that the information given to her to complete the form was provided by the superintendent, Sue Savaglio-Jarvis. (SLSOF 62, 66.)

Even if, however, Lewis was involved in the referral—even if she told O'Connor to make the referral, and even if she gave O'Connor the words to use—the information provided on the referral form was true. The two statements on the Referral form (Rosenzweig Decl. Ex. R) that Johnson appears to take issue with are 1) under "alleged misconduct," O'Connor wrote "The employee used excessive force to move a child"; and 2) under "Employment Status with School District," O'Connor wrote "Resigned in the face of immoral conduct charge."

Johnson was facing termination due to allegations that "while working with Student D, Ms. Johnson grabbed him by the arm and led him out of the cafeteria; then she grabbed Student D by the scruff of his neck with a portion of his t-shirt in her hand and dragged him down the hallway." (SLSOF 26.) The Statement of Charges also cited Board Policy 5471, which prohibits corporal punishment and limits physical force and restraint (*id.*), and recommended Johnson's termination

18

for violating that policy, among others. (*Id.*) Notably, the policy indicates that "In determining whether or not a person is using reasonable and necessary force, deference shall be given to reasonable, good faith judgments made by an official, employee or agent of the district." (*Id.*) The first statement on the referral form is true per the good faith judgment of Savaglio-Jarvis.

The second statement, that Johnson "Resigned in the face of immoral conduct charge," is also true. Wis. Stat. § 115.31 is the statute that requires administrators to report such behavior, and defines it to include "conduct or behavior that is contrary to commonly accepted moral or ethical standards and that endangers the health, safety, welfare, or education of any pupil." Wis. Stat. § 115.31(1)(c)1.

Wis. Stat. §115.31 *requires* administrators to report in certain circumstances, including when "the person resigns and the administrator has a reasonable suspicion that the resignation relates to the person having engaged in immoral conduct." Wis. Stat. § 115.31(3)(a)4. An intentional failure to report as required could result in a $1,000 fine and/or 6 months imprisonment. Wis. Stat. § 115.31(7).

It is undisputed that Johnson resigned her position; the Board accepted her resignation in open session. In the reasonable, good faith judgment of school administrators, grabbing a student and dragging him down the hall meets the statutory definition of "immoral conduct." Ben Jones, chief legal counsel for DPI, testified at his deposition that DPI expressed no concerns with the report that was filed[9] or that O'Connor did not articulate a reasonable suspicion that Johnson had

---

[9] Johnson may claim that somehow the brief summary on the Referral document was retaliatory or that exculpatory language should also have been included. That cannot possibly be sufficient to defeat summary judgment. The Referral document is intended to fulfill a statutory purpose, and DPI reviews additional information including the investigative file and the video (JONES) to determine whether to proceed further. In any case, any even arguable deficiencies in the language of the Referral are, at most,

engaged in immoral conduct (SLSOF 82); he stated that his office uses a probable cause standard (a more stringent standard) to determine next steps (SLSOF 63-64), and in this case, decided further action did not need to be taken.

Johnson has claimed that she was "exonerated" by the school board and therefore there was no reason for O'Connor, acting on the administration's behalf, to report her. Whatever Johnson's subjective belief as to what happened, she was not in actuality "exonerated." (SLSOF 53-54.) The vote to accept her resignation, while unanimous, was silent as to whether Johnson engaged in the conduct complained of. The closed session notes from Stacy Busby show dissent; at least one board member believed Johnson did not belong working in the district, and one more was concerned about how Johnson was handling the student. (SLSOF 50.) The notes do not show any vote to "exonerate" in closed session either. (SLSOF 51.)

In any case, there was no discussion in open session regarding "exoneration" and no expression of "embarrassment" as Duncan suggested there was in his Letter. (SLSOF 54.) No administration official would have witnessed any "exoneration"—they had the testimony and video and had to rely on their judgment.

Moreover, the license referral itself is a separate process from the Board hearing—it is up to the *administration* to determine whether to report. The statute provides an exception to reporting if "information the individual knows or that is the basis of the individual's reasonable suspicion has been properly reported to law enforcement and law enforcement has closed any resulting case or investigation without a conviction." Wis. Stat. § 115.31(1(c)b. The statute does

---

*de minimis,* which is insufficient to give rise to liability, even in a Sec. 1983 civil rights case. *See Swick v. City of Chicago,* 11 F.3d 85, 87 (7th Cir. 1993).

not provide an exception for a school district investigation that ends in resignation, regardless of what a school board does or does not do.

Finally, any administrator who makes a good-faith report to the DPI *is immune from civil liability for such acts.* Wis. Stat. § 115.31(5)(b). There does not appear to be case law interpreting this provision, but this provision is ripe for application to these facts. It is undisputed that the DPI declined to pursue professional discipline against Johnson, but the referral was made by O'Connor, at Savaglio-Jarvis's direction, in good faith. Civil liability cannot be imposed on the individuals who made this referral, and Lewis cannot be held liable vicariously.

In sum, the statute requires district administrators to report when a teacher resigns and the administrator reasonably suspects it was due to "immoral conduct." The statute also provides immunity from civil liability for an administrator who reports in good faith, even if the DPI later determines there is not probable cause to proceed. If the referral was proper—and there is no evidence that it was not—then nothing Lewis did or did not do regarding this referral could matter and any disputes as to her involvement are irrelevant and immaterial. She could not have acted in concert with the Defendants to deprive Johnson of her rights, if Johnson was not deprived of her rights in the first place.

None of this amounts to any conspiracy of any kind. Lewis was doing her job in her capacity as an independently retained attorney. Johnson, prompted solely by the Duncan letter (SLSOF 75), and without firsthand knowledge of any of the allegedly egregious behavior on which she bases her claim, has sued Lewis. Johnson may disagree with how Lewis did her job. That is not sufficient to sustain her claim.

Finally, to the extent that Johnson has styled her claim a "class of one" equal protection claim (ECF No. 1 ¶ 108), this claim is not recognized in a public employment context and should be dismissed on that basis alone.

> [B]ecause the government traditionally is given even more discretion in its role as employer than in its role as enforcer of the law, public employees simply do not have recourse to class-of-one claims if they are singled out for firing. To bring an equal protection claim, public employees aggrieved by their firing must be able to allege and later prove discrimination against a protected class. Under *Engquist*, the prohibition on class-of-one claims in the public employment context is categorical.

*Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (cleaned up and quoting *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 604–605 (2008) ("we are guided, as in the past, by the 'common-sense realization that government offices could not function if every employment decision became a constitutional matter'")). This is dispositive of Count 3.

Accordingly, the due process claim, and the Complaint as a whole against Lewis should be dismissed.


IV.  IN THE ALTERNATIVE, PLAINTIFF'S CLAIMS AGAINST LEWIS ARE PRECLUDED BY QUALIFIED IMMUNITY

Qualified immunity protects government actors from liability in cases involving alleged violations of constitutional rights. The Seventh Circuit has developed a two-step analysis in determining whether qualified immunity applies to a given situation.

"We first determine whether the alleged conduct violated the plaintiff's constitutional rights, and then, if rights were violated, whether they were clearly established at the time the violation occurred." *Sherman v. Four County Counseling Center,* 987 F.2d 397, 401, citing *Fiorenzo v. Nolan,* 965 F.2d 348, 351-52 (7th Cir. 1992); *Auriemma v. Rice,* 910 F.2d 1449, 1453 (7th Cir. 1990) (en banc), *cert. denied,* 115 L. Ed. 2d 970, 111 S. Ct. 2796 (1991).

To be clear, Lewis does not concede that she did anything to violate Johnson's rights. The analysis above bears this out. Still, even assuming *arguendo* that Johnson's rights were violated, *and* assuming that Lewis as a private bar attorney did act in concert with a public actor to violate those rights to the point where 42 U.S.C. § 1983 would arguably apply, Johnson still cannot recover from Lewis, because Lewis is entitled to qualified immunity.

Johnson may argue that as a private actor, Lewis is not entitled to qualified immunity (even as she seeks to hold her liable under a public actor statute), and may cite *Wyatt v. Cole*, 118 L.Ed. 2d 504, 112 S.Ct. 1827, 1834 (1992), which held the Seventh Circuit distinguished *Wyatt*'s holding that qualified immunity does not apply to private defendants facing Sec. 1983 liability regarding their private gains stemming from misuse of replevin law.

However, that argument will be misplaced. In 2012, the Supreme Court expressly extended qualified immunity to private lawyers retained by government bodies. *Filarsky v. Delia,* 566 U.S. 377 (2012).

The facts of *Filarsky* are remarkably on point here. Steve Filarsky was a private attorney hired by the City of Rialto, California, to conduct an interview of a City firefighter, Nicholas Delia, who had missed significant work ostensibly due to an on-the-job injury, and was suspected of malingering. *See Filarsky*, 566 U.S. at 381-82. Specifically, Delia was suspected of performing home improvement work during his absence, and was spotted purchasing supplies at a home improvement store. *Id.*

During the course of the interview, Filarsky first asked Delia for permission to enter his home to view the materials, then asked Delia to produce the materials outside; Delia refused. *Id.* at 381. Finally, Filarsky prepared an order, signed by the fire chief, to produce the materials, and Delia complied. *Id.* at 381-82. Delia then sued, alleging that the order to produce the materials

violated his Fourth and Fourteenth Amendments. Relevant here, Filarsky asserted qualified immunity; the trial court dismissed the case against him on that basis, but the Ninth Circuit reversed, holding that as a private attorney and not a government employee, he was not entitled to seek the protection of qualified immunity. *Id.* at 383-84.

This created a circuit split, and the Court granted certiorari. The Court reversed the Ninth Circuit and held that even though Filarsky was not a government employee, he was retained by the City of Rialto to assist in official government functions—in that case, investigating employee misconduct—and accordingly should be entitled to qualified immunity.

The Court explained the public policy rationale:

> We have called the government interest in avoiding "unwarranted timidity" on the part of those engaged in the public's business "the most important special government immunity-producing concern." Ensuring that those who serve the government do so "with the decisiveness and the judgment required by the public good," of vital importance regardless whether the individual sued as a state actor works full time or on some other basis.

> Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to " 'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.' The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. This case is a good example: Filarsky had 29 years of specialized experience as an attorney in labor, employment, and personnel matters, with particular expertise in conducting internal affairs investigations. The City of Rialto certainly had no permanent employee with anything approaching those qualifications. To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work--work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

*Id.* at 390 (cleaned up).

The same rationale should apply here: Lewis was an experienced, qualified lawyer specializing in school law. She had worked with scores of similarly situated school districts. KUSD hired her to handle the Johnson disciplinary matter; in other words, KUSD looked outside its permanent work force and secured her service to perform a *government function*. To expose her to liability for exercising a government function based entirely on the fact she does not receive a W-2 from KUSD would be contrary to the holding in *Filarsky*.

To avoid qualified immunity, Johnson would need to show not only that Lewis violated a constitutional right, but that the right was "clearly established" at the time of the violation:

> We have explained that the right must be sufficiently particularized to put potential defendants on notice that their conduct is probably unlawful. Until a particular constitutional right has been stated so that reasonably competent [government actors] would agree on its application to a given set of facts, it has not been clearly established.

*Sherman,* 987 F.2d at 401, citing *Henderson v. DeRobertis,* 940 F.2d 1055, 1059 (7th Cir. 1991), *cert. denied,* 118 L. Ed. 2d 220, 112 S. Ct. 1578 (1992) and *Auriemma,* 910 F.2d at 1453.

As illustrated in the above sections, Lewis did not violate Johnson's constitutional rights (in conspiracy or otherwise). Insofar as Johnson has alleged First Amendment claims, she is not afforded First Amendment protection for speech made in the course of her work. There is nothing in the record to suggest Johnson made any statements or conducted any advocacy as a private citizen; even looking at the entire record in the light most favorable to Johnson does not suggest there is any clearly established constitutional carve-out for her actions.

To the extent that these alleged constitutional violations occurred vis-à-vis the License Referral Form, the information on the form was true and the referral was made as Wis. Stat. § 115.31 requires. Even if others may disagree that there was "reasonable suspicion" she "resigned in the face of immoral conduct charges," or that her conduct with the pupil constituted immoral

conduct, there is no clear constitutional entitlement for KUSD or anyone acting on its behalf to take those disagreements into account before filing the Referral. Moreover, Johnson may complain that the language was not as precise or exculpatory as she would like, but we know of no clearly established constitutional right for a licensee subject to referral to have the language she would prefer.

Failing the other grounds for dismissal, this Court should dismiss the case against Lewis on the basis of qualified immunity.


CONCLUSION

For the foregoing reasons, Defendant Shana Lewis respectfully moves the Court for an Order dismissing the claims against her, with prejudice and with costs, along with such other and further relief as the Court deems just and fair.


Respectfully submitted this 31st day of August, 2023.

s/ Stacie H. Rosenzweig
Stacie H. Rosenzweig
State Bar Number 1062123
Sherre K. Chevalier
State Bar Number 1115508
Attorney for Defendant Shana Lewis

HALLING & CAYO SC
320 East Buffalo Street
Suite 700
Milwaukee, Wisconsin 53202
Telephone: (414) 271-3400
Fax: (414) 271-3841
Email: shr@hallingcayo.com
Email: skc@hallingcayo.com

26