UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SHERRY JOHNSON,

                                      Case No. 22-269

        Plaintiff,

           v.

KENOSHA UNIFIED SCHOOL DISTRICT
And SUE SAVAGLIO JARVIS

           Defendants.

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

## I.      <u>INTRODUCTION</u>

      This is a free speech retaliation case in which Plaintiff Sherry Johnson, a public-school special education teacher, exercised her constitutional right to speak at a public hearing before Defendant Kenosha Unified School District (KUSD)'s school board in the course of successfully defending herself from spurious allegations of harming a student. As a direct and immediate response to Plaintiff's participation in the public hearing, Defendants filed a bad-faith report to the state licensing board accusing Plaintiff of the very same "immoral conduct" of which she had just been acquitted.  Indeed, Defendants filed the report *despite their own school board and chief human resources officer (CHRO)* concluding that Plaintiff had done nothing wrong.  While Defendants contend they had "no choice" but to file the report, the evidence is such that only a jury should decide whether the report was "required" "paperwork" or retaliatory punishment.

## II. STATEMENT OF FACTS

| August, 2018 | First day of Johnson's second year at KUSD, Plaintiff coworker Randy Wehr declares himself head of the "special education department" and changes Johnson's special education case load (PPFOF. 1.) Two days later, Wehr changes case load back to its original level (PPFOF. 2.) |
|---|---|
| October 2018 | Wehr and Johnson meet to discuss special education policies and practices, and Wehr attempts to hug Johnson (PPFOF. 3.) |
| Nov. 1, 2018 | Despite having agreed to serve as Plaintiff's official mentor for a year, Wehr emails Plaintiff's principal, Ms. Schroeder, and resigns as Plaintiff's mentor, jeopardizing her ability to obtain a teaching license. (PPFOF. 4.) |
| May 2019 | Wehr enters Principal Schroeder's office and says "if she stays, I go," suggesting he would quit unless Plaintiff's employment ended. (PPFOF. 5.) |
| Oct. 23, 2019 | Wehr, who had been terminated from his previous special education role for retaliating against two teachers by calling them "bitches" for reporting him for not teaching special education reading classes, accuses Plaintiff of abusing a pupil in a report to Principal Schroeder. Neither Wehr nor Schroeder check on the welfare of the pupil (PPFOF. 6.) |
| Oct. 24, 2019 | Principal Schroeder views the video of Plaintiff's hallway interaction referenced in Wehr's report. (PPFOF. 7.) |
| Late-Oct. 2019 | Savaglio-Jarvis views video in O'Connor's office and tells O'Connor "This woman needs to be fired", referring to Plaintiff. (PPFOF. 8.) |

2

| | |
|---|---|
| Oct. 29, 2019 | Plaintiff is summoned to Principal Schroeder's office and told not to report for work (PPFOF. 9.) |
| Oct. 30, 2019 | Plaintiff is directed to report to Defendant KUSD's Human Resources (HR) department, where she is shown a video of the hallway interaction, asked to provide a statement, and placed on unpaid administrative leave pending an investigation. (PPFOF. 10.) |
| Nov. 26, 2019 | Defendant Savaglio-Jarvis presents Plaintiff with an official "Statement of charges" and informs Plaintiff that Defendants are seeking her termination. Plaintiff disputes the charges and offers to resign, but Defendants inexplicably reject the offer via directives they jointly provided to Defendant KUSD's Chief Human Resources Officer (CHRO), Ms. O'Connor, forcing name clearing hearing or termination. (PPFOF. 11.) |
| Nov. 26, 2019 | Plaintiff's unpaid leave begins (PPFOF. 12.) |
| Dec. 5, 2019 | Defendants' investigation of Plaintiff having concluded, a Notice for a hearing before the school board on the proposed termination of Plaintiff's hearing is scheduled for December 17, 2019, which was later changed to March 3, 2020 at 5:30pm (PPFOF. 13.) |
| March 3, 2020 | The KUSD School Board, after hearing public testimony from Plaintiff and others regarding Defendant KUSD's special education practices as well as the circumstances surrounding Plaintiff's alleged mistreatment of Student D, unanimously votes not to uphold the charges and to instead grant Plaintiff's request to resign with a neutral reference. (PPFOF. 14.) |

3

| March 3, 2020 | Attorney Hamiel, counsel for the School Board, meets with Defendants Savaglio-Jarvis and Lewis immediately after the hearing. (PPFOF. 15.) |
|---|---|
| March 3, 2020 | Defendant Savaglio-Jarvis texts CHRO O'Connor, telling her that "everything" was O'Connor's "fault"; that it was O'Connor's fault that the "the board was mad" at her and that she had to do "damage control;" and that she "should have never brought that hearing...." (PPFOF. 16.) |
| March 6, 2020 | At the direction of Defendants Lewis "and" Savaglio-Jarvis, CHRO O'Connor signs and submits a referral to the Wisconsin Department of Public Instruction (DPI) accusing Plaintiff of "immoral conduct" based on the same charges of which Plaintiff had just been acquitted. (PPFOF. 17.) |
| March 11, 2020 | DPI asks KUSD for documentation to support the referral, but Defendants do not submit the video of the incident. (PPFOF. 18.) |
| March 23-24, 2020 | In response to Plaintiff's attorney asking her why the Defendants filed the DPI referral, Defendant Lewis claims that Defendant Savaglio-Jarvis "had no choice but to file this paperwork with DPI." (PPFOF. 19.) |
| June 23, 2020 | Plaintiff first learns that her license is under investigation, via a letter from DPI preventing her to teach in the state of Texas.(PPFOF. 21.) |
| May 22, 20 | KUSD's CHRO resigns in protest of Defendants' treatment of Plaintiff and files complaint against Savaglio-Jarvis ((PPFOF. 22.) |
| October 9, 2020 | KUSD's HR Coordinator Maxine Agustus Separates from District, files complaint against Defendant Savaglio-Jarvis in part due to feeling like she |

4

| | |
|---|---|
| | was used, duped and/or coached to testify against Plaintiff at the hearing. (PPFOF. 23.) |
| Feb-March, 2021 | TEA informs Plaintiff license on hold and under investigation (PPFOF. 24.) |
| March 24, 2021 | KUSD Board Vice President emails Plaintiff and states that "her actions [with the student] were appropriate and not at all excessive"; that she had been "exonerated"; and "Sorry that this nightmare isn't over for you." (PPFOF. 25.) |
| March 31, 2021 | Phone conversation between DPI officials Neir and Jones discussing the officially DPI decision that there was No Probable Cause to support the allegations against Plaintiff referred by Defendants.  (PPFOF. 26.) |
| April 2, 2021 | DPI informs Defendant KUSD that there was No Probable Cause to support the charge against Plaintiff referred by Defendants. The decision comes 13 months after hearing.Savaglio-Jarvis. (PPFOF. 27.) |
| April 13, 2021 | Former KUSD School Board President Duncan emails to O'Connor: You may not recall, but a form was filed with DPI regarding Sherry Johnson, a License Review Referral, identifying that Sherry "used excessive force to move a child" and that she "resigned in the face of an immoral conduct charge." The form is signed off by you.  I'm asking since this makes no sense to me. As a result of the special hearing and allowing her to |

5

| | |
|---|---|
| | resign from her position as she originally requested, the Board found no fault in her actions and thought it was a travesty to have even reached this level of review. |
| | Any recall on the submission of this form and if so, why was it completed in this manner? I'm a little suspicious needless to say. (PPFOF. 28.) |
| April 13, 2021 | O'Connor responds: "I was advised to complete and submit the form to the state by Shana [Lewis] and Sue [Savaglio-Jarvis] following the hearing." (Id.) To which Duncan replies: "Exactly what I thought!" (PPFOF. 29.) |
| April 22, 2021 | KUSD severs its employment relationship with Defendant Savaglio-Jarvis. (PPFOF. 30.) |
| April 23, 2021 | KUSD severs its relationship with Defendant Lewis and her law firm. (PPFOF. 31.) |
| June 30, 2021 | Plaintiff received a letter TEA informing her that the Standard Certificate she needed to become a Texas-licensed teacher was denied (PPFOF. 32.) |
| August 8, 2021 | Former Board President Duncan letter to TEA, Tina Farrell (PPFOF. 33.) |
| October, 2021 | Agreed Final Order b/w TEA and Johnson granting Texas teaching license to Johnson. (PPFOF. 34.) |

See also Plaintiff's Responses to Defendants' Proposed Findings of Fact (R-DPFOF) and Plaintiff's Proposed Findings of Fact.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if the movant can demonstrate "that there is no genuine dispute as to any material fact" and they are thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There must also be no facts unavailable to the non-moving party. Fed. R. Civ. P. 56(d).   A fact is "material" if it "might affect the outcome of the suit" and a dispute is "genuine" if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986). In deciding a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence" in favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008) ("The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party.").

Generally, the court "'appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility.'" *Jones v. B & J Rocket Am., Inc.*, 148 F. Supp. 3d 755, 760 (N.D. Ind. 2015) (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002)). This scrutiny is particularly important in this retaliation case with respect to the causation and pretext elements.

### IV.   ARGUMENT – FIRST AMENDMENT RETALIATION

To state a First Amendment retaliation claim, Plaintiff must demonstrate that:

(1) she engaged in constitutionally protected speech;

(2) she suffered an adverse action likely to deter free speech; and

7

(3) her protected speech was at least a motivating factor of her employer's action. *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012); *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018). "The adverse action need not be an employment action, that is it need not affect the employee's conditions of employment." *Berry v. Ill. Dep't of Human Servs.*, No. 00 C 5538, 2003 U.S. Dist. LEXIS 19286, at *33-34 (N.D. Ill. Oct. 28, 2003) (citing *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000); Whether speech is protected is question of law.

**A.   Plaintiff Engaged in Protected Speech When She Testified at a Public Hearing Before the Elected School Board**

To establish that her participation in the school board hearing included constitutionally protected speech, Plaintiff must show that:

(1) she participated in her capacity as a "private citizen,"

(2) her participation "addressed a matter of public concern," and

(3) her interest in participating was not outweighed by Defendant KUSD's "interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)

**1.   Plaintiff Participated in the School Board Hearing as a Private Citizen**

In determining whether Plaintiff participated in the school board hearing as an employee or private citizen, the "controlling factor" is whether her participation in the hearing was part of her "official duties" or "professional responsibilities as a public employee." *Garcetti v. Ceballos*, 547 U.S. 410, 421-422 (2006). "The mere fact that" Plaintiff's participation in the hearing was "*about* her job, does not render it *part* of her job. *Darlingh v. Maddaleni*, No. 22-CV-1355-SCD,

8

2023 U.S. Dist. LEXIS 57756, at \*19 (E.D. Wis. Mar. 13, 2023) (emphasis in original). Subject matter is not dispositive. *Garcetti*, 547 U.S. at 421.

Under this standard, the evidence shows that Plaintiff spoke as a private citizen when she testified before the school board. First and foremost, her decision to testify was not part of her job duties or responsibilities. (PPFOF. 35.)  There is no dispute that Plaintiff's participation in the hearing was purely voluntary. (DPFOF ¶ 113.) (PPFOF ¶ 36.)  Indeed, the hearing was only held because Plaintiff exercised her right to request it. (PPFOF ¶ 37.) Further, KUSD held the public hearing after working hours, on Plaintiff's own time, while Plaintiff was on leave without pay, before a large audience of her fellow citizens, i.e. elected school board members who were not employed by Defendant KUSD and a court reporter. (PPFOF ¶ 38.)  The audience clapped when the KUSD board voted not to terminate Johnson.  (PPFOF ¶ 39.)  Reporters attended the hearing and published articles headlined: "Exclusive: KUSD Teacher Wins Termination Fight in Rare Open Session" and "Special education teacher wins termination hearing, resigns to pursue other opportunities". (PPFOF ¶ 40.)  One report noted the heavy public involvement:

> *"Outside of those who appeared at the hearing, Mrs. Johnson also stood on the shoulders of 23 individuals who provided statements of support and solidarity as she went through this experience. These were parents of children and professionals who worked with her at Prairie Lane and Grewenow, not friends and family who were outside of the situation."*  (PPFOF ¶_7.)

## 2.  Plaintiff's Hearing Testimony Addressed a Matter of Public Concern

Determining whether speech by a private citizen addresses is a matter of public concern is fact-intensive inquiry focused on the "content, form, and context" of the speech. *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (*quoting Connick v. Myers*, 461 U.S. 138, 147, (1983)). Matters of public concern are those relating to "legitimate news interest," or "a

9

subject of general interest and of value and concern to the public." *Id.* at 482. Here, Plaintiff's school board testimony—which was quoted heavily by at least two local media outlets that reported on the hearing—meets both definitions, especially given that the Supreme Court has "acknowledged the importance of allowing teachers to speak out on school matters." *Connick*, 461 U.S. at 152 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568); (PPFOF ¶ 40.)

Moreover, the school board is the body with overall responsibility for the governance of the school district; it must cope with the myriad day-to-day problems of a modern public school system. By virtue of electing them, members of the public have declared the board members qualified to deal with th issues Plaintiff addressed at the hearing, and they are accountable to the voters for the manner in which they perform.  *See generally Hortonville Joint Sch. Dist. v. Hortonville Educ. Asso*., 426 U.S. 482, 495-96, 96 S. Ct. 2308, 2315-16 (1976)(discussing the statutory role and obligation of school boards in addressing school matters).

Indeed, Plaintiff's school board testimony pertained exclusively to a matter of clear public concern: the manner and conditions in which she provided special education services to the pubic-school children of taxpaying parents. (PPFOF ¶ 42.) Her testimony did not merely "generically touch on" this subject. *Darling*, 2023 U.S. Dist. LEXIS 57756, at *20. To the contrary, this was the entire purpose and subject of the hearing, i.e. a public school teacher allegedly harming a student through use of "excessive force." (PPFOF ¶ 43) Thus, in this case Plaintiffs' response to such allegations—and all related context concerning various relevant policies, practices, etc.— is inextricably intertwined with the same matter of public concern.

Further, Plaintiff's testimony cannot be characterized as "promoting a purely private interest" or as addressing "only the personnel effect" of the subject matter simply because she spoke in the course of defending herself and her employment. *Breur v. Hart*, 909 F.2d 1035,

10

1039 (7th Cir. 1990) ("A personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern."); *see also Marshall v. Porter Cty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (noting that a subject can objectively be "a matter of public concern even if the speaker stands to gain a personal benefit" from the speech; "It is often the case that those who speak out are also involved in personal disputes with employers or other employees").

Plaintiff's school board testimony directly involved and addressed the rights, interests and safety of the public—most notably, students. (PPFOF ¶ 44.); *C.f. Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994) (holding that employee's grievance about second-hand smoke was "entirely personal" because it did not address "anyone but himself" and therefore not a matter of public concern).

Thus, Plaintiff's school board testimony—collectively, and individually with respect to those portions directly rebutting the allegations against her as well as those portions in which she addresses, as context for her defense, her working relationship with various coworkers, changes to caseloads and schedules, etc.—is starkly distinguishable from subjects of the kind of unprotected speech regarding personal concerns and "picayune internal grievances" that courts have held not to be matters of public concern. *Darling*, 2023 U.S. Dist. LEXIS 57756 at *21-22 (citations omitted).

Similarly, Plaintiff's case is distinguishable in almost every material respect from the case relied upon heavily by Defendants, *Bivens v. Trent*, 591 F.3d 555 (7th Cir. 2010). In *Bivens,* a state trooper alleged that his internal complaints to supervisors that his blood had been contaminated by lead at the employer's firing range constituted free speech. As Defendants

11

correctly note, the court rejected this argument, reasoning that it addressed a "purely personal" matter, i.e. his own alleged illness. (ECF 43 at 17).

Indeed, *Bivens* is so distinguishable that it actually supports Plaintiff's argument by way of comparison. An internal grievance about a personal illness is a far cry from a public due process/ name clearing hearing concerning public allegations that a public-school teacher abused a member of the public.

3. **The *Pickering* Balancing Test Favors Plaintiff, as Her Speech had No Negative Impact on Defendants' Operations or Plaintiffs' Ability to Do Her Job But Was Vital to the Elected School Board's Decision-Making**

In addition to demonstrating that she was speaking as a private citizen on a matter of public concern, Plaintiff must establish that her "interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Pickering*, 391 U.S. at 568. In balancing these interests, courts must consider the following factors:

> "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public."

*Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016). With respect to the seventh factor, the fact that Plaintiff spoke as a private citizen does not mean that she should be regarded as a "member of the general public" for purposes of the *Pickering* balancing test. *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792-793 (7th Cir. 2015). Nor is there any question that her job

12

was one in which personal loyalty and confidence are necessary (factor two). Thus, both of these factors favor Defendants.

However, the remaining five (5) factors all favor Plaintiff. With respect to factors one and three, there is no reason to believe that Plaintiff's school board testimony created "problems in maintaining discipline or harmony among coworkers" or impeded her ability to perform her responsibilities, and Defendants neither argue nor cite evidence to the contrary. To the contrary, Plaintiff was circumspect in her testimony, focusing on the matter at hand without resorting to any harsh, broad or incendiary criticism or allegations. (PPFOF ¶ 45.) Indeed, the KUSD Board approved of Johnon's hearing testimony so much that several Board members came up to her and hugged her. (PPFOF ¶ 46.).

With respect to factors four and five, it is undisputed that Plaintiff's testimony was provided voluntarily, on her own time, and in a public hearing before an audience of 30+ members of the public. (PPFOF ¶ 48) By the time the hearing ended, i.e. **barely 3 days** before the retaliatory action at issue, Plaintiff was no longer even an employee of Defendant KUSD. (PPFOF ¶ 49.) These factors both weigh in Plaintiff's favor. Defendants could not possibly have had any legitimate employee interest in curtailing Plaintiff's ability to provide truthful, sworn testimony at a public hearing regarding a matter of public concern.

Finally, factor six—whether the matter was one on which debate was vital to informed decision-making—weighs the heaviest in Plaintiff's favor. It is beyond dispute that Plaintiff's testimony was "vital" to the elected School Board's ability to make an informed decision with respect the matter at issue in the hearing, i.e. whether Plaintiff had used "excessive force" in handling a student. (PPFOF ¶ 50.) Indeed, public teachers' ability to speak and contribute openly to public debates concerning the operation of public schools underscores *Pickering's* reasoning,

13

where the Court held that a teacher's letter to a local newspaper criticizing his school board's allocation of school funds constituted protected free speech (even though several of the letter's assertions were false). 391 U.S., at 569-577.

Thus, with five of the seven Pickering factors in her favor, Plaintiff's free speech interest in participating in the school board hearing outweighed any cognizable, countervailing interest of Defendants, who respectively make only a cursory argument to the contrary, largely regurgitating its arguments regarding employee vs. citizen speech and matters of public vs. personal concern. To the extent Defendants claim that protecting Plaintiff's speech would somehow impair its "interest in conducting employment investigations," the argument is not sufficiently coherent to fully rebut, beyond pointing out that Defendants did, in fact, conduct an investigation; had 19 weeks to do so, and also had the additional opportunity to present evidence and testimony and conduct cross-examination at the hearing. (ECF 43 at 18).

### 4. Defendants' DPI Report Would Deter A Reasonable Person in Plaintiff's Circumstances From Engaging in Free Speech

In a First Amendment retaliation claim, retaliatory adverse conduct is actionable if it is "likely to deter the exercise of free speech" and thus may include "even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday." "*Summers,* 226 F.3d at 820. The likelihood of such a chilling effect is an objective inquiry of whether, under the given circumstances, the conduct is "likely to chill a person of ordinary firmness from continuing to engage in that activity." *Berry*, U.S. Dist. LEXIS 19286, at *34 (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see also DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) (holding that "false accusations" "may suffice" as actionable adverse conduct for purpose of First Amendment retaliation claim).

14

While the scope of retaliatory conduct is much broader for First Amendment retaliation, courts nonetheless analyze First Amendment retaliation claims using the "the same burden-shifting mechanism" applicable in Title VII retaliation cases, whereby an employee must first identify protected activity and subsequent adverse employment action. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). Generally, under Title VII and similar employment statutes, former employees may bring post-employment retaliation if the retaliation includes conduct which "impinges on their future employment prospects or otherwise has a nexus to employment." *Ruedlinger v. Jarrett*, 106 F.3d 212, 214 (7th Cir. 1997). Such retaliation may include negative job references, blackballing, and threats to report employees to state licensing boards. *E.g. Bogden-Cozmuta v. Granby Urgent Care*, LLC, No. 3:20-cv-00879-VLB, 2022 U.S. Dist. LEXIS 177037, at *22-23 (D. Conn. Sep. 29, 2022) (denying summary judgment in an FLSA retaliation claims and reasoning "[it] is difficult to see how threatening to report Plaintiff to the state licensing board, who presumably has the ability to revoke Plaintiff's license and thus impede his ability to work in his profession, could not be an adverse employment action").

Thus, Defendants' report of Plaintiff to Wisconsin DPI easily constitutes an adverse action likely to deter a reasonable person's in her shoes from engaging in free speech. Indeed, a direct result of the report and ensuing months-long pending review, Plaintiff was unable to secure a teaching license required to earn a job and compensation as a fully licensed teacher. (PPFOF ¶ 51); *see Lewis v. City of Chi.*, 496 F.3d 645, 654 (7th Cir. 2007) (holding that denial of training was an adverse action because it curtailed future opportunity and future pay, reasoning that "[a]dverse employment actions should not be defined so narrowly as to give an employer a "license to discriminate.")

15

**5. Plaintiff's Participation in the School Board Hearing Motivated and Caused Defendants' DPI Referral**

Generally, "[p]retext is a lie, specifically a phony reason for some action, and thus, to show pretext, a plaintiff must show that (1) the employer's nondiscriminatory reason was dishonest; and (2) the employer's true reason was based on a discriminatory intent." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008) (quotations omitted) A plaintiff can do this with evidence that the Defendant's reasons are "not credible" or "factually baseless" as well as other circumstantial evidence that the reasons are "so fishy and suspicious" that a reasonable juror could infer that the real reason is retaliatory. *Id.* at 403-04. Pretext evidence also includes any "weaknesses, implausibilities, inconsistencies, or contradictions in defendant's stated reason" for the adverse action, *Silva v. Wisconsin*, 917 F.3d 546, 561 (7th Cir. 2019),  as well as "miscellaneous facts suggestive" of a retaliatory motive, such as "an employer's departure from its own policies" and "other bits and pieces" from which retaliatory intent may be inferred. *Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 882 (7th Cir. 2016); *Boumehdi v. Plastag Holdings, L.L.C.*, 489 F.3d 781, 792 (7th Cir. 2007).

October 23, 2019 was the date of the incident that resulted in the allegations against Plaintiff. (PPFOF ¶ 52). On October 29, Plaintiff was placed on administrative leave. (PPFOF ¶ 53). On November 26, 2019, she was provided a written statement of the charges against her. (PPFOF ¶ 54). The School Board hearing on the proposed termination Plaintiff's employment, originally scheduled for December 17, was ultimately held on March 3, 2020—about **19 weeks** after Defendant KUSD learned of the incident and allegations. (PPFOF ¶ 55).

Defendants offer no credible explanation of why the DPI report, which it contends it was legally mandated to make, was not submitted during this 19-week period and was instead

16

submitted on March 6, 2019—**3 days** after Plaintiff's protected First Amendment activity. (PPFOF ¶ 56). This inexplicably suspicious timing alone is by itself nearly sufficient indicia of pretext to preclude summary judgement.

But the timing of the DPI report is far from the only evidence of pretext Plaintiff has identified. Indeed, the evidence regarding context and content of the DPI report includes multiple hallmarks of pretext and bad faith, including:

- The fact that the DPI report was made despite the School Board unanimously finding that Defendants had failed to meet their low burden of proof to support Plaintiff's termination Plaintiff, with at least one member referring to Plaintiff as having been fully "exonerated" (PPFOF ¶ 73 .) ;

- The fact that the DPI report omitted any reference to fact that the allegations against Plaintiff had been addressed at an evidentiary hearing and found to be unsubstantiated Plaintiff (PPFOF ¶ 58.) ;

- The fact that Defendant KUSD's Chief Human Resources Officer had staunchly opposed and advised against bringing the charges against Plaintiff (PPFOF ¶ 60.) ;

- The fact that Defendants' Human Resources Coordinator—a key witness for Defendants at the hearing—later reported that her testimony was "coached" by Defendant Lewis Plaintiff, according to a school board member (PPFOF ¶ 61, 63 .) ;

- The fact that Board members, in full view of Defendants Lewis and Savaglio-Jarvis, approached the Plaintiff after the vote to allow her to resign to "apologize to her for having held the hearing." (PPFOF ¶ 41.)

- The fact that the School Board president was so perturbed by the fact that Defendants had reported Plaintiff to DPI that he sent a lengthy email excoriating Defendants to the Texas

17

licensing body, where Plaintiff was struggling to obtain a license due to the DPI report Plaintiff  (PPFOF ¶ 33.)  ;

- The fact that DPI ultimately concluded that Plaintiff had not engaged in any misconduct. Plaintiff  (PPFOF ¶ 27.)

Thus, there is sufficient evidence for a jury to conclude that Defendants' decision to report Plaintiff to the DPI was retaliatory, and that but-for her decision to participate in a public hearing on the matter, the DPI report would not have been submitted.

Lastly, Defendants' argument that state law "required" submission of the DPI report (which Defendant disingenuously characterized as "paperwork" shortly after he hearing)  is misleading because it is premised on a key disputed fact, i.e. that the report was made based on a good-faith, "reasonable suspicion," as opposed to a bad-faith, retaliatory motivation. (ECF 43 at 26-27). It is undisputed and self-evidence that state law does not only does not require, but in fact prohibits, the filing of false, bad-faith reports of teacher misconduct to DPI. See generally Wis. Stat. § 115.31(5)(b)(including "good faith" as the determinative factor in whether a superintendent enjoys immunity for making, or failing to make, certain DPI reports). Thus, try as they might, Defendants cannot rely on this statute as a get-of-of-jail free card, just as Defendant Savaglio-Jarvis cannot avail herself of qualified immunity for bad-faith conduct.

## V.  ARGUMENT – EQUAL PROTECTION / CLASS OF ONE

Plaintiff recognizes that public employees "simply do not have recourse to class-of-one claims if they are singled out for firing." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012)(citing  *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 607 (2008)). The *Engquist* court's reasoning for this rule mirrored the reason for distinguishing matters of private concern from protected first amendment speech, i.e. avoiding the problems inherent in allowing a public

18

employee to "constitutionalize the employee grievance" 553 U.S. at 609 (quoting *Connick,* 461 U.S., at 154 ). Courts have generally and consistently declined to act as supra-personnel departments, and, unsurprisingly, the Court in *Engquist* followed suit.

But because Plaintiff's class-of-one Equal Protection claims are based solely on the bad-faith, post-employment DPI referral, not a termination or other quotidian personnel action[1], *Engquist*'s limitation on public employees' ability to state class-of-one claims is inapplicable.

While Defendants do not address the applicability of *Engquist* to post-employment retaliatory conduct, they do rely, via string citation, on *Clark v. Milwaukee Cty.*, which appears to be the only decision in this jurisdiction to expressly apply *Engquist* to post-employment conduct against a former public employee. No. 18-CV-503, 2018 U.S. Dist. LEXIS 208585, at *14 (E.D. Wis. Dec. 11, 2018). In *Clark*, a physician-contractor brought a class-of-one equal protection claim based on his former employer public employer's decision to enter a report in the "National Practitioner Data Bank" (NPDB) that he "had voluntarily surrendered clinical privileges while under, or to avoid, investigation relating to professional competence or conduct." *Id.* at *2-4. Importantly, Clark "voluntarily resigned from [Milwaukee County employment] and surrendered his medical privileges." *Id.* at *5. In dismissing the physician's equal protection claim, the court cited *Engquist*, reasoning that the post-employment nature of the NPDB report was immaterial because it "arose out of" the employment relationship and because the county acted: "as an employer, and not as a lawmaker." *Id.* at *14-15.

---

[1] To the extent her complaint could be read to include claim based on constructive discharge or any other action other than the DPI report, Plaintiff hereby withdraws such claims.

Plaintiff submits that the reasoning in *Clark* is flawed in its interpretation of the breadth of *Engquist's* holding, which was focused broadly— but specifically and expressly—on public employer's "personnel decisions", i.e. the "multitude[inous]" kind of personnel decisions that that are "made daily" by public employers. 553 U.S. at. 609. Under a plain reading, these mine run personnel decisions include things like terminations, suspensions, discipline, job assignments, employee benefits, hiring decisions, etc. But a post-employment decision, made by a Superintendent in concert with a private attorney, to report a former employee to a state licensing board months after they had stepped foot in a classroom is of a different ilk entirely. Moreover, the phrase *Clark* uses to define the universe of *Engquist*-barred claims, i.e. all those which "arose out of the public employment"—is found nowhere in *Engquist*.

Similarly flawed is *Nash v. Montgomery Cty.*, the only other decision Plaintiff could find, nationwide, interpreting *Engquist's* categorical ban on certain class-of-one claims by public employees to include post-employment conduct against former public employees under the "arise from" standard created in *Clark*. No. GJH-20-1138, 2021 U.S. Dist. LEXIS 63464, at *13 (D. Md. Mar. 31, 2021). In *Nash*, the conduct at issue concerned a former public employee's benefits, which the court cursorily reasoned "arise from public employment" such that the action was still "within the public employment context regardless of the amount of time that has passed since Plaintiff's retirement." *Id*. at *12 (quotations omitted). The court also noted that the plaintiff was still able to avail herself of certain employment-related grievance processes[2] despite being retired. *Id.* at *13.

<hr />

[2] Plaintiff, in contrast, had no such post-employment process to challenge or reverse Defendants' referral decision.

Taken to their logical conclusions, the *Clark* and *Nash* holdings would mean that the "public employment context" would extend indefinitely, such that any public agency with a long memory could do *anything*, at *any point* in the future, to arbitrarily or maliciously target and retaliate against a former employee without fear of an equal protection claim. In other words, whenever the person's status as a former public employee has anything do with why they are in the government's crosshairs, the conduct, no matter how egregious— or how attenuated or distinct from "personnel actions"—would necessarily be found to "arise out of" the past public employment. Such an interpretation could render absurd results.[3]

Finally, even if *Clark* and *Nash*'s interpretation is correct, the facts of those cases are materially distinguishable from those of the present case. *Nash* involved retirement benefits earned during the plaintiff's employment which thus undisputedly "arose out of" employment in a way that differs dramatically from the hotly disputed origin, purpose and motivation of the post-employment DPI referral at issue in this case. Similarly, in *Clark*, the plaintiff-physician alleged merely that the report was "unwarranted"—the case involved no free speech retaliation allegations or public hearing. In contrast, Plaintiff alleges that Defendants' DPI referral was not only false and unwarranted but also made in bad faith as retaliation for her participation as a private citizen at an open hearing to address the allegations against her.

Unlike in *Clark*, it is undisputed that Plaintiff did not resign in lieu of termination or "while under, or to avoid, investigation." 2018 U.S. Dist. LEXIS 208585 at *2-4. There was no pending or impending investigation at the time of the school board hearing, Plaintiff's

---

[3] For example, suppose the plaintiff in *Geinosky* had been a former City of Chicago employee, and the 20+ bogus traffic tickets he was harassed with were retaliation for, or otherwise related to, something that occurred during his employment. Under the reasoning in *Clark* and *Nash, Engquist* might have barred his claim.

21

resignation, or the DPI referral. Despite the undisputed fact that the school board did not vote to sustain the charges against Plaintiff on which Defendants bore the burden of proof, and the extensive evidence that, to the contrary, the Board found in Plaintiff's favor and exonerated her, Defendants strain to characterize Plaintiff's resignation as akin to the one at issue in *Clark*. But that characterization is false. Plaintiff resigned not because of any impending termination or pending investigation, but because, despite the victory at the hearing, she already was employed at a nearby school district who knew about the KUSD allegations and hired her anyway, and because she wanted to move on with her life rather than return to work in the wake of false allegations. (PPFOF ¶ 74).

Thus, sufficient evidence exists for a jury to conclude that Defendants' decision to make a bad-faith report arose out of the public hearing and related animus, not out of Plaintiff's public employment, which had ended by the time the decision[4] to render the report was made. The decision to report Plaintiff to DPI was therefore materially distinct from the decisions at issue in *Engquist* and its progeny i.e. the "multitude of personnel decisions that are made daily by public agencies." *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 349 (1976)).

Relying solely on *Engquist*, Defendants do not address the facts of Plaintiff's class-of-one claim with respect to the DPI report. Such facts support denying summary judgement, because they demonstrate the Defendants irrationally targeted Plaintiff with the DPI referral. Specifically:

---

[4] The *Clark* decision mentions the date of the report, but not the date that the decision was made to submit the report.

- Defendants forced a reluctant CHRO to sign and file the DPI referral immediately after th hearing, when the Plaintiff was no longer employed by KUSD (PPFOF 70, 71  );

- The DPI referral came just 3 days after the school board resolved the matter in plaintiff's favor and voted for KUSD to provide her with a "neutral" letter of reference (Id.);

- Shortly after causing the DPI referral, Defendants misleadingly and hyperbolically claimed that their decision was legally "required", and that failure to make the referral would result in jail or fines (PPFOF 56 );

- Defendant Savaglio-Jarvis and Lewis's conduct, including the DPI referral, once revealed, resulted in their dismissal by Defendant KUSD (PPFOF 29, 30, 31);

Indeed, Plaintiff's allegation that Defendants targeted her for a malicious and arbitrary bad-faith DPI report is precisely the kind of arbitrary and malicious government action that gives rise to class-of-one equal protection claims. *Geinosky,* 675 F.3d at 747 ("One element of a proper class-of-one claim is a wrongful act that necessarily involves treatment departing from some norm or common practice."). To hold otherwise would unnecessarily and dramatically expand the already broad scope of *Engquist* limitation on class-of-one equal protection claims to anyone ever employed by a government.

The same facts addressed above as supportive of the causation and pretext element of Plaintiff's First Amendment claim also support her class-one-claim, because they demonstrate a clear basis for a jury to conclude that Defendants DPI report was a wrongful act that deviated from normal practice, i.e. a bad-faith report made 19 weeks after the fact and without the support of Human Resources of the school board. Indeed, that is precisely the conclusion that the School Board president, Mr. Duncan, came to.

23

Realizing this, Defendants Savaglio-Jarvis and Lewis doth protest too much in contending that they had nothing to do with the DPI referral—a key assertion that is directly contradicted by the testimony of former KUSD CHRO Linsey O'Connor, who testified that Savaglio-Jarvis and Lewis, acting together, forced her to file the DPI referral. (PPFOF 70.) Thus, sufficient evidence exists from which a jury could conclude that Defendants' bare assertion that they were legally to make the DPI report based on a "reasonable suspicion" is no more than post-facto pretext for arbitrary and malicious government action based on a false premise, i.e. a false characterization of the circumstances of Plaintiff's resignation. Indeed, Defendant Savaglio-Jarvis refused to explain how she came to the conclusion that O'Connor based the filing of the DPI referral on what happened at the hearing because she claims she did not discuss the filing of the DPI referral with O'Connor. (PPFOF 71.)

Finally, like the plaintiff in *Geinosky* who was subjected to "bogus parking tickets," Plaintiff is not required to present comparator evidence, i.e. employees treated more favorably, to maintain a class-of-one claim. 675 F.3d at 748. Where, as here, retaliatory conduct is unique, arbitrary and malicious such that comparators might logically include every teacher in the district, comparator evidence does "not help distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection." *Id.* Rather, the circumstances and "nature of defendants' alleged conduct do the work of demonstrating the [defendants'] improper discriminatory purpose." *Id.*

## VI.   RETALIATION FOR ADA PROTECTED ACTIVITY

During her testimony before the school board, Plaintiff engaged in ADA-protected activity when she testified about the needs of special education students not being met, i.e. Defendant KUSD failing to properly accommodate certain students' disabilities. PPFOF ¶¶

24

42).___("I couldn't do it by myself. There was no way to meet all the needs he needed;" and PFOF ¶¶ 72.). ("She wasn't meeting the needs of the student, Student D"). Generally, ADA-protected activity is interpreted broadly consistent with the ADA's status as a remedial statute, and includes reports and requests regarding disabled students' right to accommodations. *E.g.* P.*N. v. Greco*, 282 F. Supp. 2d 221, 242 (D.N.J. 2003) (holding that student and parent "engaged in protected activity for the purposes of § 504, including advocacy for J.N. and other similarly situated students, along with requests for accommodations of J.N.'s disability").

It is undisputed that Defendant KUSD's Superintendent, Defendant Savaglio-Jarvis, was present for the entirety of Plaintiff's hearing testimony on March 3, 2020. It is also undisputed that, three days later, Savaglio-Jarvis caused the CHRO to submit a report to DPI accusing Plaintiff of having engaged in "immoral conduct"; that the knew the Board had no sustained the allegations against Plaintiff; and that Savaglio-Jarvis omitted all reference to the hearing and/or Board's decision from the DPI referral form despite the form containing room for her to do so. (PPFOF ¶¶ 58)_ Accordingly, Plaintiff has identified sufficient evidence upon which a jury could conclude that Defendant KUSD retaliated against Plaintiff for engaging in ADA-protected activity.

## VII.   DEFENDANT LEWIS ACTED UNDER COLOR OF LAW TO IRRATIONALLY AND MALICIOSLY TARGET AND RETALIATE AGAINST PLAINTIFF.

To prevail against Defendant Lewis as a conspirator with respect to Plaintiff's free speech retaliation and equal protection claims, Plaintiff must show that Defendant Lewis was a "willful participant in [a] joint activity" with Defendant Savaglio-Jarvis, and that such activity was intended to violate her constitutional rights. *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). Thus, the "joint activity" to which Plaintiff must connect Defendant Lewis

25

as "willful participant" is the retaliatory, bad-faith, and irrational DPI referral. Plaintiff has identified more than sufficient evidence of such a connection. Indeed, the evidence shows that Defendant Lewis, in lockstep with Defendant Savaglio-Jarvis, took multiple actions in furtherance of the DPI referral. First and foremost, the evidence shows Defendant Lewis stepping outside her role as an attorney-advisor when she personally directed CHRO O'Connor to sign and submit the referral. She did so alongside and in concert with Defendant Savaglio-Jarvis. (PPFOF 69.). O'Connor had never heard of a DPI license referral prior to the Johnson hearing. She drafted the DPI referral on the explicit instruction of Lewis and Savaglio-Jarvis. (Id.) O'Connor "pushed back" against filing the referral but was rebuffed by Savaglio-Jarvis and Lewis. Savaglio-Jarvis told O'Conner: "You're still required to do it because there was an investigation." (PPFOF 70.)

Similarly, Lewis and Savaglio-Jarvis worked in concert to control the Johnson investigation. (PPFOF 59.) They forced O'Connor to bring the accusation against Johnson, which they drafted together, even though O'Connor opposed them. (PPFOF 60.) KUSD's own investigations found that Defendants Lewis and Savaglio-Jarvis jointly coached witnesses in at least two cases including Agustus at the Johnson March 3rd hearing. (PPFOF 61, 62.) Augustus told President Duncan that Savaglio-Jarvis and Lewis coached her to testify to her: "personal family situation in order to convince us all that something had been done improperly with a special-education student since she has a special-education child." (PPFOF 20, 63.)

Savaglio-Jarvis and Lewis also secretly altered public records by editing HR documents, including e.g. the statements of charges at issue in this case, in green pen and then directed district employees to reauthor the documents as if they wrote them. (PPFOF 64.) This practice went beyond HR— all members of the leadership team, including HR, would submit their

26

reports and other documents to: "Dr. Sue for approval and then she would make edits and give them back. (PPFOF 65.) Lewis, and Savaglio-Jarvis altered public records and destroyed evidence; In an effort to conceal her concerted efforts with Defendant Lewis, Savaglio-Jarvis ordered KUSD HR employes to shred her drafts of their documents for the purpose of evading public records law. (PPFOF 66.)

Defendant Lewis also conducted the hearing and made key decisions related to the hearing. School Board member Tom Duncan was perturbed by Defendant Lewis's conduct during the hearing, and asked Board attorney Chrissy Hamiel to take a recess in front of Lewis and expressed his reservations about the case to Attorney Hamiel and the Board. (PPFOF 67.) Once again, Defendant Lewis was not acting in concert with Defendant Savaglio Jarvis to railroad Plaintiff, not as counsel to KUSD bringing a good-faith prosecution.

## VIII. CONCLUSION

The proposed termination of a public school teacher's taxpayer-funded employment due to allegations of abusing a student is a matter of public concern. The public has a crucial interest not only in knowing the basis for such allegations but in knowing the full facts and circumstances in which the allegations arose as well as the teachers' response. Plaintiff furthered these interests when she exercised her First Amendment rights at an open-to-the-public hearing before the elected School Board.

The potential chilling effect at issue is clear: if public schools are allowed to target and retaliate against teachers who speak publicly, as citizens, about matters of public concerns such as the circumstances of proposed terminations like the one at issue in this case by going after

27

their licenses, teachers like Plaintiff will be far less likely to speak up, and the taxpayers and

elected school board members will be left in the dark. Defendants' motion should be denied.

Dated this 16th Day of October, 2023

Respectfully Submitted,

**CROSS LAW FIRM, S.C.**
Attorneys for Plaintiff Sherry Johnson

/s/ Ben Hitchcock Cross
Ben Hitchcock Cross
Bar Number: 1066395
Mary C. Flanner (#101305)
mflanner@crosslawfirm.com

Cross Law Firm, S.C.
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055

28