UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHERRY JOHNSON,

          Plaintiff,

v.                                                                Case No. 22-cv-0269-bhl

KENOSHA UNIFIED SCHOOL DISTRICT ET AL,

          Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

      In the fall of 2019, Plaintiff Sherry Johnson was the subject of a disciplinary hearing following an admittedly "unprofessional" incident that occurred during her employment as a special education teacher at the Kenosha Unified School District (KUSD). The incident involved Johnson pulling a special needs student down a hallway by the collar of his shirt. After hearing testimony about the incident, the KUSD School Board voted unanimously to allow Johnson to resign without making any finding that she had engaged in wrongdoing and with an agreement to issue a "neutral" letter of recommendation concerning her departure. After the hearing, however, KUSD's Chief Human Resources Officer, Lindsey O'Connor, filed a License Review Referral form with the Wisconsin Department of Public Instruction (DPI), as required by state law whenever a teacher resigns and there is reasonable suspicion of potential misconduct. The referral then led to a DPI investigation that eventually determined Johnson had not, in fact, engaged in misconduct. But the existence of the investigation caused licensure problems for Johnson in Texas, where she had since moved. The Texas Education Agency (TEA) opened its own investigation and, at least initially, denied Johnson a teaching certificate based on her failure to disclose the Wisconsin DPI investigation. Johnson later appealed that decision and is now licensed in Texas.

      This messy saga led Johnson to bring this lawsuit against KUSD, the District Superintendent, Sue Savaglio-Jarvis, and the District's outside counsel, Shana R. Lewis. Johnson alleges that she is the victim of retaliation for statements she made at her disciplinary hearing. She claims KUSD violated the Americans with Disabilities Act (ADA) by unlawfully retaliating

against her because of her criticisms of the district's special education practices. Johnson also claims that Savaglio-Jarvis and Lewis violated her First and Fourteenth Amendment rights by retaliating against her for engaging in First Amendment protected activity and by depriving her of her equal protection rights in connection with the misconduct hearing. Defendants have now moved for summary judgment on all claims. After completion of summary judgment briefing, Defendant Lewis also filed a motion for sanctions against Plaintiff's counsel. For the reasons given below, Defendants' motions for summary judgment will be granted, and Lewis's sanctions motion denied.

## FACTUAL BACKGROUND

Johnson is a former special education teacher. (ECF No. 60 ¶6; ECF No. 61 ¶9.) Defendant Savaglio-Jarvis served as the superintendent of Defendant KUSD from 2014 through 2021. (ECF No. 61 ¶¶2–4.) Defendant Lewis is an attorney who performed legal work for KUSD for several years while she was employed at Renning, Lewis & Lacy. (*Id.* ¶¶5–6; ECF No. 60 ¶¶1, 5.)

Starting in 2013, Johnson was a substitute teacher at Prairie Lane Elementary School within KUSD. (ECF No. 61 ¶¶8–9.) KUSD hired Johnson to be a special education teacher for three one-year contracts beginning in 2017, pending her receipt of a special education license from DPI. (*Id.* ¶¶9, 12–13.) Each year, Johnson had several special education students assigned to her, usually in two different grade levels, ranging from kindergarten through third grade. (ECF No. 60 ¶7; ECF No. 61 ¶¶24–25.) Johnson was responsible for providing services as outlined in each student's Individualized Education Plan (IEP). (ECF No. 61 ¶56.) Prairie Lane's principal, Camille Shroeder, was Johnson's direct supervisor. (*Id.* ¶¶10–11.) At least initially, Johnson performed her duties largely without incident. (ECF No. 60 ¶11.)

During the 2019–20 school year, one of Johnson's coworkers, Randy Wehr, witnessed Johnson leading one of her special education students through the hallways by his shirt collar, walking at a rapid pace. (*Id.* ¶12; ECF No. 61 ¶64.) That student had special needs, including Down Syndrome and ambulation difficulties, and had a hard time keeping up with Johnson. (ECF No. 60 ¶12; ECF No. 61 ¶¶64–65, 67.) Wehr perceived Johnson "to be frustrated" during the encounter. (ECF No. 61 ¶67.) Aware of the student's mobility issues, Wehr had concerns about the interaction and reported the incident to Shroeder. (*Id.* ¶¶65–66, 68.) Shroeder reviewed video of the incident, saw Johnson quickly walking down the hallway holding the student by his tee shirt

at the scruff of his neck, and reported the incident to KUSD's human resources department. (*Id.* ¶72; ECF No. 60 ¶14.)

KUSD Chief Human Resources Officer Lindsey O'Connor and Human Resources Coordinator Maxceen Augustus investigated the incident. (ECF No. 60 ¶15.) They reviewed Shroeder's report in which Shroeder stated she thought Johnson's handling was not physically appropriate or acceptable. (ECF No. 61 ¶78.) They also interviewed Wehr, Johnson, and Shroeder, among others. (ECF No. 60 ¶16.) During her interview, Johnson admitted the video looked unprofessional. (ECF No. 60 ¶17; ECF No. 61 ¶90.) She later emailed Augustus, acknowledging that she should have slowed down but emphasized that she did not hurt the child and was not angry or stressed at the child. (ECF No. 60 ¶18.) The District's Human Resources Department then placed Johnson on administrative leave. (*Id.* ¶23.)

The Human Resources Department concluded that Johnson's actions violated KUSD's Employee Handbook, KUSD's School Board Policy, and Johnson's job description. (ECF No. 61 ¶101; ECF No. 60 ¶27.) It then prepared a Statement of Charges, signed by Savaglio-Jarvis, alleging that Johnson had used "unreasonable and excessive force" on the student in violation of the handbook, board policy, and her job description. (ECF No. 66 ¶108.) The Statement of Charges also concluded that just cause existed to terminate Johnson's employment. (ECF No. 61 ¶107–109.) On November 26, 2019, Johnson met with O'Connor, who presented her with the Statement of Charges and notified her that it was being recommended that her employment be terminated and that she had the right to a hearing to challenge the charges. (ECF No. 66 ¶¶103, 141.) Johnson denied wrongdoing and requested a public hearing. (ECF No. 60 ¶29.)

Johnson's hearing took place on March 3, 2020, and lasted almost five hours. (ECF No. 61 ¶¶111, 119.) Both sides presented opening statements, elicited testimony from witnesses on direct and cross examination, presented documentary evidence, and made closing arguments. (*Id.* ¶¶118, 120–121.) School Board members were also permitted to question witnesses, after which the parties could ask follow-up questions. (*Id.* ¶118.) Nine witnesses, including Johnson, testified. (*Id.* ¶114.) The attorneys also played the video of the incident. (*Id.* ¶121.) In addition to discussing the incident, Johnson testified that Wehr and another teacher failed to meet the needs of certain special needs students. She admitted, however, that she never reported either of them to her supervisor or HR. (ECF No. 41-10 at 33–34.) Johnson admits that she received "a full and fair opportunity to present her side of the story." (ECF No. 61 ¶132.)

At the conclusion of the hearing, a board member moved to resolve the proceedings by allowing Johnson to resign with a neutral letter of reference. (ECF No. 66 ¶127.) The motion was seconded, and the Board voted unanimously in favor of the motion. (*Id.*) The Board made no finding of wrongdoing. (*Id.* ¶128.)

Immediately after the hearing, Board Attorney Chrissy Hamiel, Savaglio-Jarvis, and Lewis met. (ECF No. 65 ¶¶15, 68.) Savaglio-Jarvis later texted O'Connor telling her that "everything" was O'Connor's "fault." (*Id.* at ¶16.) She also told O'Connor the Board was angry at Savaglio-Jarvis. (*Id.*) As a result, Savaglio-Jarvis told O'Connor that she felt she had to do "damage control," that the hearing never should have taken place, and that the charges should not have been brought. (*Id.*)

On March 6, 2020, O'Connor filed a License Review Referral form for Johnson with DPI. (ECF No. 61 ¶155–156; ECF No. 65 ¶17.) Because O'Connor was new to school district human resources, she consulted Savaglio-Jarvis before filing. (ECF No. 61 ¶157.) Savaglio-Jarvis confirmed that state law obligated KUSD to notify DPI whenever the school board allowed a licensed employee to resign in circumstances where there was a reasonable suspicion that the employee had engaged in immoral conduct. (*Id.* ¶158.) From prior training with DPI legal counsel, Lewis was also aware that the district was required to submit a referral form whenever there was a reasonable suspicion to believe an employee resigned or was terminated due to immoral conduct. (ECF No. 60 ¶81.) The final License Review Referral form included the date of Johnson's alleged misconduct and indicated Johnson had used excessive force to move a child. (ECF No. 61 ¶¶160–61.) DPI legal counsel testified in discovery that DPI believed the referral review articulated a reasonable suspicion that Johnson had indeed engaged in misconduct. (ECF No. 60 ¶82.) If DPI found probable cause of Johnson's misconduct, it could suspend or revoke her teaching license. (ECF No. 61 ¶171.)

After the district filed the referral, DPI requested more information. (ECF No. 60 ¶68; ECF No. 61 ¶164.) Lewis responded on September 10, 2020, sending DPI the transcript of the disciplinary hearing along with an inquiry from Smith asking about the referral and neutral letter of reference. (ECF No. 60 ¶68; ECF No. 61 ¶169.) O'Connor asked DPI if they wanted the video of the incident, but DPI never responded. (ECF No. 61 ¶¶165, 168.) DPI investigated the matter over several months. (ECF No. 61 ¶172.)

While DPI was investigating the incident, Johnson applied for a teaching license in Texas, and Texas's DPI-equivalent, TEA, also investigated the incident. (ECF No. 60 ¶71.) Once DPI knew Johnson had applied for a license in Texas, the Wisconsin agency expedited its investigation and, on April 2, 2021, concluded there was no probable cause to believe Johnson had engaged in immoral conduct and thus closed its investigation. (ECF No. 61 ¶¶172-73.) On April 8, 2021, TEA asked Johnson for a statement describing, in her own words, the October 2019 incident. (*Id.* ¶185.) DPI sent the video of the incident and its own investigation report to the Texas agency, and Johnson herself advised TEA that her Wisconsin license investigation was dismissed. (*Id.* ¶¶186–87.)

Amidst these investigations, KUSD's former School Board President Thomas Duncan tried to assist Johnson. After finding out that Johnson was having trouble obtaining a Texas teaching license, he reached out to TEA. (ECF No. 60 ¶72; ECF No. 61 ¶205.) In an August 8, 2021, email, Duncan told TEA that the KUSD School Board had come to the "unanimous conclusion that Sherry Johnson had been wrongly accused and determined there were no grounds for termination." (ECF No. 61 ¶212; ECF No. 60 ¶73.) Duncan's email went on to say that the Board had been "embarrassed" by the hearing, that Augustus was "forced to provide testimony" regarding her own special needs child, and that O'Connor resigned following the incident and formally complained to the Board about the investigation. (ECF No. 60 ¶73.) He also reported that Savaglio-Jarvis had forced O'Connor to file an "inaccurate" license referral to DPI. (*Id.*) And he indicated that Augustus had been "coached" in connection with her hearing testimony, though he later clarified that Augustus had been "informed as to what she should be saying during the hearing." (*Id.*; ECF No. 61 ¶215.) Much of the information in his email is based on hearsay statements he obtained from Augustus, O'Connor, and other Board members. (ECF No. 61 ¶¶221, 223.) He also reported that one of his last acts as President had been to remove Lewis's law firm from KUSD's approved list of vendors because of Lewis's "aggressive" conduct. (ECF No. 61 ¶¶210–11.) At the time of his email, Duncan's term as School Board President had ended and he was working elsewhere. (ECF No. 61 ¶220.)

On June 30, 2021, TEA denied Johnson's one-year certification application after finding that she had filed a fraudulent application and improperly handled a student when walking down the hall. (*Id.* ¶¶189–90.) Specifically, TEA found that Johnson had erroneously checked the box stating that her license had never been under investigation. (*Id.* ¶191.) Johnson appealed this

decision, and, on October 7, 2021, stipulated to an Agreed Final Order that she would be given a standard teaching certificate with an "inscribed reprimand" and received a license to teach special education in Texas. (*Id.* ¶¶196, 198.) This suit followed.

## LEGAL STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could affect the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1289–90 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts" and provide specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citing Fed. R. Civ. P. 56(e)). Those specific facts must be supported by admissible evidence. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the

non-moving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## ANALYSIS

Johnson's Complaint asserts three claims: (1) an Americans with Disabilities Act retaliation claim against KUSD, (2) a First Amendment retaliation claim against Savaglio-Jarvis and Lewis, and (3) a Fourteenth Amendment Equal Protection violation against Savaglio-Jarvis and Lewis. (ECF No. 1 ¶¶92–114.) Defendants have moved for summary judgment on all three claims. Amidst summary judgment briefing, Lewis also moved to sanction Johnson's counsel. (ECF No. 52.) For the reasons given below, summary judgment will be granted, and Lewis's motion for sanctions denied.

**I. Johnson Has Not Proffered Sufficient Evidence of Retaliation in Violation of the ADA.**

Johnson's first claim is for ADA retaliation against the school district. Under the ADA, employers are prohibited from retaliating against employees who assert their right to be free from discrimination under the act. 42 U.S.C. § 12203(a). To succeed on an ADA retaliation claim, a plaintiff must show that: (1) "[s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse action; and (3) a causal connection between the two." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)). Johnson claims that KUSD unlawfully retaliated against her after she voiced her belief that the district had violated the ADA by providing inadequate educational services. (ECF No. 1 ¶¶92–98.)

Among other reasons, KUSD contends it is entitled to summary judgment because Johnson has not shown that she engaged in an ADA-protected activity. (ECF No. 43 at 6–9.) Activity statutorily protected under the ADA "includes opposition to 'any act or practice made unlawful by this chapter' . . . .'" *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (citing 42 U.S.C. § 12203(a)). Therefore, to have engaged in statutorily protected activity, Johnson's statements must have opposed an act made unlawful by the ADA.

Johnson points to her own hearing testimony, which she contends shows that she engaged in ADA-protected activity by testifying "about the needs of special education students not being met." (ECF No. 58 at 24.) She cites two specific statements. First, she quotes her response to questions about a student's IEP in which she said that she "thought [she] couldn't do it by [herself]. There was no way to meet all the needs he needed, so every [teacher] met in [a] room and []

collaborated together on everything in that IEP." (*Id.* at 25; *see also* ECF No. 41-10 at 33.) Second, Johnson highlights her testimony that an aid was not meeting the needs of a student. (ECF No. 58 at 25; *see also* 41-10 at 34.) She insists that this testimony concerned KUSD's failure to properly accommodate students' disabilities. (ECF No. 58 at 24–25.)

These statements, and Johnson's retaliation claim, implicate both the ADA and the Individuals with Disabilities Education Act (IDEA). The ADA makes it unlawful for public entities to exclude an individual from participation in or deny the benefits of its services, programs, or activities on the basis of a qualified disability. 42 U.S.C. § 12132. The IDEA is a federal statute under which schools receive federal funds to help provide a "free appropriate public education" to children with physical or intellectual disabilities. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017) (citing 20 U.S.C. § 1401(3)(A)(i)). The IDEA utilizes IEPs for each eligible child to ensure the child is receiving an adequate education. *Id.* (citing 20 U.S.C. § 1414(d)). Though both the IDEA and the ADA work in tandem, they are distinct: (1) the IDEA ensures children with disabilities receive an adequate education; and (2) the ADA protects children with disabilities from discrimination based on their disability. *See id.* at 158–161. Because the ADA defines discrimination as "not making reasonable accommodations" for a disabled individual, *see* 42 U.S.C. § 12112(b)(5)(A), a failure to implement a proper IEP may also result in an ADA violation, *see Fry*, 580 U.S. at 158–161.

The Court agrees with Defendants that, when reviewed in full and in context, neither statement constitutes ADA-protected activity because neither was made in opposition to an alleged violation of the ADA. In her first statement, Johnson simply stated that she could not implement a student's IEP on her own. (ECF No. 41-10 at 33.) This is hardly surprising and does not reflect the district's noncompliance with the ADA. Indeed, Johnson went on to confirm in her testimony that she had assistance from others. She reported that teachers worked together to collaborate on the IEP and that she had help from a host of others, including the student's physical therapist, speech therapist, technology assistant, and the occupational therapist. (*Id.*) Accordingly, nothing in her statement can be reasonably interpreted as an assertion that KUSD was not making reasonable accommodations. Therefore, this statement cannot be found to be made in opposition to an ADA violation.

Johnson's second statement also does not constitute opposition to an ADA violation sufficient to support a retaliation claim. While her testimony concerned an aid's allegedly

unsatisfactory performance, Johnson went on to testify that the aid was reassigned *by KUSD* because the aid was not meeting the needs of the student. (*Id.* at 34.) Again, this statement does not oppose an ADA violation by KUSD: if Johnson's statement about the aid's performance is true, then KUSD responded appropriately by removing the aid from that assignment. Therefore, this second statement was also not made in opposition to an ADA violation. Because Johnson has not come forward with evidence that she made a statement in opposition to an act made unlawful by the ADA, she cannot show that she was engaged in protected ADA activity, and her ADA retaliation claim against KUSD fails.

Even if Johnson had made statements protected by the ADA, her claim would nevertheless fail because it suffers from a lack of causation. Defendants correctly point out that, even if Johnson was engaged in statutorily protected activity, Wisconsin law required KUSD to report Johnson to DPI following the incident with the special needs student. (ECF No. 67 ¶5.) Johnson asserts that Defendants did not necessarily need to report her to DPI. She insists Savaglio-Jarvis improperly directed O'Connor to report Johnson to DPI even though "the[y] knew the Board had no[t] sustained the allegations against Plaintiff." (ECF No. 58 at 25.)

To establish that protected ADA activity caused the adverse action, the plaintiff must show that, but for the protected activity, the adverse action would not have occurred. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013). This may be shown through direct evidence or, more commonly, circumstantial evidence. *Rowlands v. United States Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018). Direct evidence is rare, as it requires an admission that the harm was because of the protected activity. *Id.* at 802. Circumstantial evidence of retaliation, on the other hand, may be shown by "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.*

All parties acknowledge that Wisconsin state law requires administrators to report a licensed employee if "[t]he person resigns and the administrator has a reasonable suspicion that the resignation relates to the person having engaged in immoral conduct." Wis. Stat. § 115.31(3)(a)(4); (*see also* ECF No. 60 ¶81; ECF No. 66 ¶160). Immoral conduct is defined to include "conduct or behavior that is contrary to commonly accepted moral or ethical standards and

that endangers the health, safety, welfare, or education of any pupil." *Id.* § 115.31(1)(c)(1). Failure to report may result in a fine or imprisonment. *Id.* § 115.31(7).

There is no dispute that Johnson resigned from her position because there was video evidence of Johnson "having [a student] by the tee shirt at the scruff of the neck moving swiftly down the hallway." (ECF No. 65 ¶11; ECF No. 66 ¶72.) This conduct, which was captured on video, was, at worst, immoral, and at best, "unprofessional." (*See* ECF No. 60 ¶17; ECF No. 66 ¶87). It undisputedly endangered the safety of the disabled student. Given the video evidence, KUSD was required to report Johnson to DPI under Wisconsin law. The statute errs on the side of requiring reporting, because "[w]hen a teacher comes under reasonable suspicion of abusing students, the state's interests are obvious and powerful. Everyone has an interest in resolving the situation accurately, fairly, and quickly." *Fritz v. Evers*, 907 F.3d 531, 535 (7th Cir. 2018) (Hamilton, J. concurring). Under the plain language of the statute, it does not matter that the Board ultimately did not terminate Johnson and instead elected to allow her to resign, (ECF No. 66 ¶127); the only way the hearing would have precluded the statute from applying is if Johnson had remained employed at KUSD at the end of it, *see* Wis. Stat. § 115.31(3)(a)(3)–(4). Johnson's resignation in lieu of termination after the incident is exactly the scenario this statute applies to. Because Johnson has not shown but-for causation, her retaliation claim fails on causation grounds.

**II.     Johnson's Speech Is Not Protected by the First Amendment.**

Johnson's second claim is a First Amendment retaliation claim against Savaglio-Jarvis and Lewis. She contends that Savalgio-Jarvis and Lewis threatened to and in fact constructively discharged her in retaliation for her advocacy of the special education rights of a student. (ECF No. 1 ¶¶100–106.) To establish a prima facie case of First Amendment retaliation, Johnson must establish that (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights, and (3) her speech was a motivating factor in Savaglio-Jarvis and Lewis's adverse action against her. *See Deeren v. Anderson*, 72 F.4th 229, 235 (7th Cir. 2023) (citing *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022)).

Johnson's burden is complicated by her status as a public employee. Public servants "must accept certain limitations on [their] freedom," because when they speak out, "they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006). This is balanced against the fact that "a citizen who works for the government is nonetheless a citizen," and is therefore entitled to

First Amendment protections. *Id.* at 419. To reconcile these competing considerations, the Court asks whether the "employee spoke as a citizen on a matter of public concern, and if so, [whether] her interest as a citizen in commenting on the matter of public concern outweighed the State's interest in promoting effective and efficient public service." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008) (quoting *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). In other words, Johnson's speech must (1) have been spoken as a private citizen (2) have been regarding a matter of public concern, and (3) outweigh KUSD's interest in promoting effective and efficient public service.

Savaglio-Jarvis and Lewis argue that Johnson's speech was not constitutionally protected both because she spoke as an employee and because she did not address a matter of public concern. (ECF No. 43 at 13-18; ECF No. 36 at 15-17.) Savalio-Jarvis also argues that Johnson was not subjected to an adverse action motivated by any speech. (ECF No. 43 at 19-21.) Johnson counters that she participated in the School Board hearing as a private citizen because, under *Garcetti*, her decision to testify was not a part of her job duties or responsibilities, her participation was voluntary, and it was after working hours. (ECF No. 58 at 9.) She also argues that her testimony addressed a matter of public concern because it involved the interests and safety of students, who are members of the public. (*Id.* at 10.) She also contends that the reporting DPI was the adverse action motivated by her testimony. (*Id.* at 14–15.)

When a public employee makes a statement "pursuant to [her] official duties, the employee[] [is] not speaking as [a] citizen[] for First Amendment purposes, and the Constitution does not insulate [her] communications from employer discipline." *Garcetti*, 547 U.S. at 421. Official duties are not limited to the formal job description; instead, the Court must engage in a practical inquiry into what duties the employee is expected to perform. *Houskins*, 549 F.3d at 490. Official duties are not interpreted narrowly. *Spiegla*, 481 F.3d at 966. So long as the speech "owe[s] its existence" to the professional responsibility, it will not receive First Amendment protection, even if the employee was "not strictly required to make it." *Sweet* v. *Town of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2021) (quoting *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539 (7th Cir. 2016), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). Additionally, the Seventh Circuit has held that public testimony in a hearing is made pursuant to the public employee's official duties when that employee is appearing

as an employee, and not as an individual. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1091–92 (7th Cir. 2008). Under *Sweet*, this Court does not consider whether Johnson's speech concerned her duties—instead, it must consider if the disciplinary hearing "owe[d] its existence to [Johnson's] professional responsibilities." 18 F.4th at 279.

The record establishes that the hearing happened because of Johnson's performance of her duties as a special education teacher. This takes her speech outside the protections of the First Amendment. Johnson asserts that, because she elected to have the hearing and it was public, it was outside the scope of her duties. (ECF No. 58 at 9.) This contention ignores *Sweet*'s direction that it does not matter if the employee was not required to make the statement. Ultimately, disciplinary hearings are a component of the teaching relationship between Johnson and KUSD. Teachers working for KUSD face the possibility of a hearing if they challenge disciplinary action against them. (*See* ECF No. 65 ¶¶11, 13.) It does not matter if Johnson was not required to have a hearing or that she elected for a public hearing; the hearing itself owed its existence to Johnson's professional responsibilities as a teacher. (*See id.* ¶11; *see also* ECF No. 66 ¶112.) Johnson's testimony was made as an employee of KUSD facing potential disciplinary action, not as an individual sharing her concerns about the public school system. Accordingly, Johnson's speech at the hearing was made in her capacity as a public employee, not as a private citizen. Therefore, it was not subject to First Amendment protections.

Even if Johnson's speech was protected, however, her claim would still fail on causation grounds. Johnson asserts that the harm incurred was Defendants reporting of the incident to DPI. (*See* ECF No. 58 at 15.) Unlike an ADA retaliation claim, causation for First Amendment retaliation need only be shown by evidence that the "protected activity is *a* motivating favor in the defendants' conduct." *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 586 (7th Cir. 2021). Causation may be shown through circumstantial evidence, which includes "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [persons] in the protected group." *Id.* If the plaintiff meets this burden, it shifts to the defendants to produce evidence that they would have engaged in the adverse act even in the absence of the protected activity; it then becomes the plaintiff's burden to show the reason given was pretextual, and retaliatory animus was the real reason for the adverse action. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).

The record confirms that Defendants referred Johnson to DPI because they were required to do so by state law. This is an independent cause that was in place regardless of Defendants' motivations. In response, Johnson argues that "Defendants offer no credible explanation of why the DPI report . . . was not submitted during [the period between the incident and the hearing] and was instead submitted . . . 3 days after Plaintiff's protected First Amendment activity." (ECF No. 58 at 16–17.) Defendants correctly point out, however, that they were not legally required to report Johnson until after she was charged with a crime, convicted of a crime, or resigned in the face of immoral conduct. (ECF No. 67 at 11–12); *see also* Wis. Stat. § 115.31(3)(a).

Johnson also maintains the DPI report was pretextual and made in bad faith, stating a litany of reasons for her belief. (ECF No. 58 at 16–18). But this again ignores KUSD's reporting obligations under Wisconsin law. Based on the video of the incident and Johnson's resignation, KUSD and its agents had no discretion—Wisconsin law required them to report the incident. Johnson's arguments to the contrary rely on evidence that other members of the community believed the hearing should not have happened, but such beliefs do not change Wisconsin's mandatory reporting law. It is undisputed that, after receiving the charges, Johnson offered to resign, and this offer was rejected. (ECF No. 65 at ¶11.) Had the offer been accepted, KUSD would still have been required to report Johnson to DPI. *See* Wis. Stat. § 115.31(3)(a)(4). And, as discussed above, regardless of what Johnson said at the hearing, once the hearing ended with her resignation, KUSD had no discretion not to report her to DPI. Since the DPI report was inevitable, it cannot be said that Johnson's statements at the hearing were a motivating factor to report her. Therefore, Johnson's First Amendment retaliation claim fails.

### III. Savaglio-Jarvis and Lewis Are Correct that Johnson Cannot Raise a Fourteenth Amendment Claim Class-of-One Claim in the Public Employment Context.

Johnson's final claim is a Fourteenth Amendment Equal Protection claim against both Savaglio-Jarvis and Lewis.[1] She claims that Savaglio-Jarvis and Lewis conspired to deny her equal protection rights by filing a false and malicious license referral to DPI after her separation because of Johnson's testimony during the due process hearing. An equal protection class-of-one theory under the Fourteenth Amendment requires a plaintiff to prove "that [s]he has been 'intentionally treated differently from others similarly situated and that there is no rational basis

---

[1] In her complaint, Johnson fashions her third claim as Due Process violation. (ECF No. 1 ¶¶107–114.) In her response brief, however, she clarifies that this claim is a Fourteenth Amendment class-of-one claim of disparate treatment. (ECF No. 58 at 18-19.)

for the difference in treatment.'" *Forgue v. City of Chicago*, 873 F.3d 962, 968 (7th Cir. 2017) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Both individual defendants point out that the Supreme Court has held that a class of one Equal Protection Claim does not exist in the public employment context. *See Engquist v. Oregon Dep't of Ag.*, 553 U.S. 591, 605 (2008) ("[T]he class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context."). To allow "every [public] employment decision [to] bec[o]me a constitutional matter" would only "undermine the very discretion that such state officials are entrusted to exercise." *Id.* at 603, 607.

Johnson tries to avoid *Engquist* by arguing that her Fourteenth Amendment claim rests on a class-of-one Equal Protection theory for the "bad-faith, post-employment" DPI referral, making her claim more of a "post-employment retaliatory" one and *Engquist* inapplicable. (ECF No. 58 at 19.) She also states that to the extent her complaint includes any other Fourteenth Amendment claim, she withdraws those claims. (*Id.* at 19 n.1.)

The parties' briefing includes extensive sparring over the application of *Engquist* and two district court cases interpreting it: *Clark v. Milwaukee County*, No. 18-cv-503, 2018 WL 6504371 (E.D. Wis. Dec. 11, 2018) and *Nash v. Montgomery County*, No. GJH-20-1138, 2021 WL 1222874 (D. Md. Mar. 31, 2021). *Clark* involved an independent contractor doctor who worked for Milwaukee County until voluntarily resigning and surrendering his medical privileges. After his resignation, the County's Director of Medical Services entered a report in the National Practitioner Data Bank concerning the doctor's voluntary surrender of clinical privileges to avoid an investigation related to professional competence or conduct. *Id.* at *1. The doctor then brought an Equal Protection class-of-one claim, alleging the report in the national database was not warranted because he was not under an investigation as a matter of law and that the defendants had not made such a report against other doctors in similar circumstances. *Id.* at *2. This Court applied *Engquist*'s bar on public employment class-of-one claims to dismiss Clark's claims. *Id.* at *5-6. In *Nash*, a district court in Maryland discussed the outer-bounds of *Engquist* when dismissing a former public employee's a class-of-one claim based on her employer's "irrational" reduction of retirement benefits. *Id.* at *4. According to *Nash*, because "the benefits at issue ar[o]se from public employment, the action [was] still within the 'public employment context'"

even though a significant amount of time had passed since the end of the plaintiff's employment, rendering the claim barred by *Engquist*. *Id.*

Under *Engquist*, Johnson's class-of-one Equal Protection claim must be rejected. Her claim arises from her public employment, and, as the Supreme Court held, "[t]o treat [public] employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Engquist*, 553 U.S. at 605. The Court's ruling is also consistent with both *Clark* and *Nash*. Indeed, the licensure report at issue was made almost immediately after Johnson's resignation and was inextricably connected to her public employment.

Moreover, even if *Engquist* did not bar the claim, it would also fail based on the undisputed facts. To succeed in a class-of-one claim, a plaintiff must show that she "was singled out arbitrarily, without rational basis, for unfair treatment." *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010). Johnson has offered no evidence that other teachers' licenses were not referred to DPI. She cannot prove a class-of-one claim without demonstrating that Savaglio-Jarvis and Lewis treated her differently than other similarly situated employees. For that reason alone—even without contemplating whether the license referral to DPI was within the public employment context—Johnson's Fourteenth Amendment fails. Summary judgment must therefore be granted in favor of Savaglio-Jarvis and Lewis with respect to Johnson's Fourteenth Amendment claim.

## IV. The Court Will Not Issue Sanctions Against Plaintiff's Counsel.

Amidst the summary judgment briefing, Lewis filed a motion for sanctions against Johnson's counsel, Ben Hitchcock Cross. Lewis complains that Cross engaged in frivolous, abusive, and harassing tactics to move the litigation forward. (ECF No. 53 at 1.) In particular, Lewis claims Cross knew or should have known that the complaint is factually frivolous because it "always" lacked evidentiary support and legally deficient because the claims against Lewis were never legally cognizable. (*Id.* at 3.) Lewis also claims that Cross's behavior was either objectively frivolous or undertaken subjectively bad faith, and that his "conduct . . . suggests bad faith at the very least."[2] (*Id.* at 4.)

---

[2] Lewis implores the Court to review the transcript of her deposition "in its entirety" to understand the "vexatious and harassing nature of Cross's conduct." (*See* ECF No. 53 at 4.) The Court reviewed portions of the transcript, and Cross's questioning pushed the limits of zealous advocacy at times and was needlessly combative. (*See, e.g.*, ECF No. 31-4 at 174-75; 300-02.) But the transcripts do not show that counsel crossed the line and unnecessary aggressiveness does not by itself mean bad faith.

"Rule 11 requires attorneys to certify that every court filing advances arguments warranted by existing law or a nonfrivolous argument for extending the law." *McGreal v. Vill. of Orland Park*, 928 F.3d 556, 558 (7th Cir. 2019) (citing Fed. R. Civ. P. 11(b)(2)). "Similarly, the factual contentions attorneys advance must have evidentiary support or be likely to have evidentiary support after a reasonable opportunity for further investigation." *Id.* at 558–59 (citing Fed. R. Civ. P. 11(b)(3)). Both provisions are evaluated objectively. *See Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986) ("Rule 11 requires counsel to study the law before representing its contents to a federal court. An empty head but a pure heart is no defense."). If an attorney fails to comply with these professional requirements, Rule 11 allows for sanctions. *See* Fed. R. Civ. P. 11(c). "The court must 'undertake an objective inquiry into whether [Plaintiffs' counsel] should have known that his position [was] groundless." *Cuna Mut. Ins. Soc'y v. Off. & Pro. Emps. Int'l Union, Loc. 39*, 443 F.3d 556, 560 (7th Cir. 2006) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 963 (7th Cir. 1993)). Rule 11 sanctions "are designed to deter baseless filings," but "because sanctions can harm the reputation of attorneys and chill the creativity of counsel, care must be taken in their issuance." *Mazurek v. Metalcraft of Mayville, Inc.*, 110 F.4th 938, 942 (7th Cir. 2024). Therefore, whether to award sanctions is "left to the sound discretion of the district court." *Foreman v. Wadsworth*, 844 F.3d 620, 627 (7th Cir. 2016).

Lewis first claims that Cross failed to adequately investigate claims before he filed the complaint. (ECF No. 53 at 5.) Johnson, in her deposition, stated she relied entirely on Duncan's letter when choosing to file suit, but, Lewis argues, it quickly became evident Duncan's letter lacked evidentiary support. (*Id.* at 7–8.) Lewis further contends that Cross violated Rule 11(b)(3) because neither he nor Johnson corroborated Duncan's letter prior to filing suit and Duncan's deposition testimony later revealed many of the allegations in the letter were unverified and some were in fact demonstrably false. (*Id.* at 10.) Cross counters that Lewis's motion is based on a misunderstanding of Johnson's legal arguments, an inaccurate characterization of the evidence, and an incorrect assumption that Johnson was fully aware of all the facts Cross learned during his investigation of the case. (ECF No. 68 at 1.) Cross further argues that credibility issues by themselves cannot support a Rule 11 motion and that he had no reason to doubt the veracity of Duncan's letter. (ECF No. 68 at 16.)

At the time of filing the complaint, Johnson believed Lewis and Savaglio-Jarvis conspired to terminate her employment at KUSD. The Duncan letter corroborated that theory. His

deposition testimony may have left an open question as to his credibility; however, credibility determinations are left to the factfinder, not the Court. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Johnson's case certainly suffered upon the taking of discovery, but it was by no means a guaranteed loser. Augustus's letter regarding her thoughts of Savaglio-Jarvis provide some heft to the theory that Lewis and Savaglio-Jarvis worked in concert to retaliate against Johnson. However, the evidence Cross marshalled was not enough to stave off summary judgment. While Cross's filings could have been more thoughtful, "[m]ere clumsy lawyering is not enough" to impose sanctions. *See Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018).

As for the legal issues, Lewis states that Johnson's First Amendment and Fourteenth Amendment claims were barred after Johnson's deposition, and Cross had a legal obligation to withdraw them. (ECF No. 53 at 10-12.) Lewis further argues that Johnson's First Amendment claim is barred under *Garcetti* and her Fourteenth Amendment claim was barred under *Engquist*. (*Id.* at 11.) Johnson counters that *Garcetti* does not bar her claim, because her testimony was not a part of her duties or responsibilities. (ECF No. 68 at 5.) Cross's legal arguments, while unpersuasive, are not sanctionable. The focus of Rule 11 is the attorney's conduct, not the results: "losing a legal challenge or motion, by itself, is not a reason for sanctions." *Mazurek,* 110 F.4th at 942. Cross did not ignore any controlling precedent, which would have been a "paradigm of frivolous litigation." *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 809 (7th Cir. 2003). He instead made unpersuasive arguments to distinguish that precedent on the facts of his case, arguments which ultimately failed. *See Mazurek*, 110 F.4th at 946 ("[A]n attempt to distinguish one's case from the precedent that purportedly forecloses the claim is enough [to avoid sanctions]."). While not laudable, his conduct does not warrant sanctions.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motions for summary judgment, (ECF Nos. 33 & 37), are **GRANTED**. The case is dismissed. The Clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Lewis's motion for sanctions, (ECF No. 52), is **DENIED**.

Dated at Milwaukee, Wisconsin on September 30, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge